## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMAD FAYYAZ and<br>GIZELA FAYYAZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, through its Secretary,<br>MICHAEL CHERTOFF; EMILIO<br>GONZALEZ, Director, UNITED<br>STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES (USCIS);<br>SHARON HUDSON, District Director,<br>USCIS Houston; and ROBERT<br>MUELLER, Director, FEDERAL<br>BUREAU OF INVESTIGATION (FBI),<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 06cv2016 (HHK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MOTION TO TRANSFER OR,
## IN THE ALTERNATIVE, TO DISMISS

COME NOW, the above-named Defendants, by and through their attorney, the United

States Attorney for the District of Columbia, and respectfully move this Court to transfer this

case to the Southern District of Texas.  In the alternative, Defendants move to dismiss this case

for lack of jurisdiction and for failure to state a claim upon which relief can be granted, pursuant

to Fed. R. Civ. P. 12(b)(1) and (6).  In support of this Motion, Federal Defendants refer the Court

to the accompanying memorandum of points and authorities.  A proposed Order consistent with

this Motion also is attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


_____/s/_____
KAREN L. MELNIK, D.C. Bar #436452
Assistant United States Attorney
555 4th Street, N.W. Rm. E 4112
Washington, D.C. 20530

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMAD FAYYAZ and<br>GIZELA FAYYAZ,<br><br>    Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, through its Secretary,<br>MICHAEL CHERTOFF; EMILIO<br>GONZALEZ, Director, UNITED<br>STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES (USCIS);<br>SHARON HUDSON, District Director,<br>USCIS Houston; and ROBERT<br>MUELLER, Director, FEDERAL<br>BUREAU OF INVESTIGATION (FBI),<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)     CIVIL ACTION NO. 06cv2016 (HHK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER OR, IN THE ALTERNATIVE, TO DISMISS**

Defendants Michael Chertoff, Secretary of the Department of Homeland Security, et al., respectfully move to transfer this case to the Southern District of Texas or, in the alternative, to dismiss the Complaint for Mandamus filed by the Plaintiff in the above-captioned matter.

I.    **FACTUAL BACKGROUND**

On October 5, 1977, Plaintiff was born in Pakistan. See Declaration of Sharon A. Hudson ("Hudson Decl."), USCIS Houston District Director, attached hereto as Exhibit A at ¶ 7(a). On December 22, 2002, he was admitted to the United States as a non-immigrant F-1 student. See id. at ¶ 7(b). Plaintiff was authorized to attend Texas Southern University in Houston, Texas. See Exhibit B. On November 14, 2003, Plaintiff married a United States

citizen.  <u>See</u> Hudson Decl. at 7(c).  The marriage occurred in Houston, Texas.  <u>See</u> Exhibit C.

Since January 1999 to the present time, Plaintiff has resided in or near Houston, Texas.  <u>See</u>

Exhibit D and Complaint at ¶ 5.

On June 29, 2004, Plaintiff and his spouse filed a Form I-130 visa petition and a Form I-

485 application to adjust status to a lawful permanent resident.  <u>See</u> <u>id.</u> at ¶ 7(d) and Exhibit A-1

and A-2 attached thereto.  USCIS commenced the mandatory criminal and national security

background checks, including the FBI name check on July 5, 2004.  <u>See</u> <u>id.</u> at ¶ 7(e).[1]

Adjudication of a properly filed I-485 application to adjust status lies with the USCIS district

director having jurisdiction over the alien's place of residence.  <u>See</u> 8 CFR § 245.2(a).  On

February 10, 2005, based on jurisdictional requirements, a USCIS Houston District

Adjudications Officer interviewed Plaintiff and his spouse. <u>See</u> <u>id.</u> at ¶ 7(f).  On that same date,

USCIS approved Plaintiff Gizela Fayyaz's I-130 visa petition.[2]  <u>See</u> <u>id.</u> at 7(g) and Exhibit A-1

attached thereto.

Since the interview, USCIS has been unable to complete adjudication of the adjustment

status application because the mandatory FBI name check remains pending as of the date of the

attached declaration.  <u>See</u> <u>id.</u> at ¶ 7(h).  The FBI name check process is detailed and set forth

both on the USCIS and FBI public websites.  <u>See</u> <u>id.</u> at ¶ 8 and Exhibits A-3 and A-4 attached

thereto.  These documents clearly set forth the security checks that USCIS must complete prior

to approval of any application.  These fact sheets demonstrate that, although the vast majority

---

[1]  The FBI name check is conducted in Washington, D.C., but the results are ultimately forwarded to the USCIS Houston, Texas, District Office as part of the overall local adjudication of the application for adjustment of status.  <u>See</u> Hudson Decl. at n.3.

[2]  Since USCIS approved Plaintiff Gizela Fayyaz's I-130 visa petition, there are no outstanding issues with respect to this Plaintiff.

2

clear quickly, FBI name checks can remain pending on applicants for longer periods of time, but that such delays involve only approximately one percent of the USCIS applications received each year.  See id.

USCIS is mandated to perform and await favorable completion of the national security FBI name check, and is mandated to have all background checks current and favorably resolved prior to approval of any application.  See id. at ¶ 9 and Exhibit 5 attached thereto; see also Public Law 103-317, 108 Stat. 1724, Aug. 26, 1994, which in part amended 8 U.S.C. § 1255, by mandating that "The Immigration and Naturalization Service shall conduct full fingerprint identification checks through the Federal Bureau of Investigation for all individuals over sixteen years of age adjusting immigration status in the United States pursuant to this section."

Houston USCIS monitors all pending FBI name check cases weekly.  See id. at ¶ 10. Once USCIS receives the FBI name check clearance, assuming the name check clears with no possibly derogatory information, USCIS will also be required to ensure that Plaintiff's fingerprint results have not expired, and will be required to update the IBIS background checks which have expired, prior to approving the application for adjustment of status or issuing a lawful permanent resident card.  See id.  If, however, USCIS receives any derogatory information as a result of the FBI name check, USCIS is mandated to investigate and resolve that derogatory information prior to completion of the application adjudication.  See id. at ¶ 11.

Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration benefits has required procedures that sometimes result in individuals not receiving a response to their application as quickly as in the past.  See id. at ¶ 12.  However, the law and public safety requires USCIS to make certain that the checks have been done before it adjudicates and approves an application to

3

ensure the applicant's eligibility for the benefit.  See id.

On November 27, 2006, Plaintiffs filed the instant Complaint for Mandamus against Defendants, seeking to compel Defendants to adjudicate Plaintiff's application for lawful permanent residence.  See Complaint at ¶ 2.  The action is also brought against Defendants to compel action on a petition for alien relative.  See id.  The visa petition, however, was approved by USCIS Houston on February 10, 2005, mooting that issue.  As Defendants demonstrate below, the Complaint should be transferred to the Southern District of Texas where venue is proper. In the alternative, this case should be dismissed because this Court lacks subject matter jurisdiction, and because the Complaint fails to state a claim upon which relief may be granted.

## II.    STANDARD OF REVIEW FOR MOTION TO DISMISS

The standard to be applied in deciding a motion to dismiss is well-established.  For purposes of deciding whether a Plaintiff has failed to state a cause of action, the factual allegations of the complaint must be taken as true, and all ambiguities or doubts in the factual allegations must be resolved in favor of the pleader.  Caudle v. Thomason, 942 F.Supp. 635, 638 (D. D.C. 1996).  Despite this generous standard, the complaint still must set forth sufficient factual information to suggest that there exists some recognized legal theory upon which relief can be granted.  Id.  A court must dismiss a complaint where, even assuming all the factual allegations are true, Plaintiff has failed to establish a right to relief based upon those facts.  Id.

The Plaintiff bears the burden of establishing the court's subject matter jurisdiction.  See Miller v. United States, 710 F.2d 656, 662 (10th Cir.), cert. denied, 464 U.S. 939 (1983); Baird v. United States, 653 F.2d 437, 440 (10th Cir. 1981), cert. denied, 454 U.S. 1144 (1982).  In deciding a motion under Rule 12(b)(1), the Court may go beyond the allegations of the Complaint.  See Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947); Herbert v. National Academy of

4

<u>Sciences</u>, 974 F.2d 192, 197-98 (D.C. Cir. 1992); <u>Haase v. Sessions</u>, 835 F.2d 902, 906 (D.C.

Cir. 1987); <u>Bonterra America, Inc. v. Bestmann</u>, 907 F.Supp. 4, 5 n.1 (D.D.C. 1995); <u>Kuffel v.</u>

<u>United States Bureau of Prisons</u>, 882 F. Supp. 1116, 1120 (D.D.C. 1995).  Additionally, a court

may properly take judicial notice of court records without converting a motion to dismiss into a

motion for summary judgment.  <u>E.g.</u>, <u>Baker v. Henderson</u>, 150 F.Supp.2d 17, 19 n. 1 (D.D.C.

2001) (""in determining whether a complaint fails to state a claim, the court may take judicial

notice of matters of a general public nature, such as court records, without converting the motion

to dismiss into one for summary judgment.");  <u>Himmelman v. MCI Communications</u>, 104

F.Supp.2d 1, 3 (D.D.C. 2000) ("[t]he court may consider [on a motion to dismiss] the allegations

of the complaint, documents attached to or specifically referred to in the complaint, and matters

of public record.").  This is so because a motion under Rule 12(b)(1) "calls into question the

court's power to hear the plaintiff's claim ... and therefore imposes upon courts an affirmative

obligation to ensure that they are acting within the scope of their jurisdictional power."  5A

Wright & Miller, Federal Practice & Procedure 2d § 1350; <u>see</u> <u>also</u> <u>District of Columbia</u>

<u>Retirement Bd. v. United States</u>, 657 F.Supp. 428, 431 (D.D.C.1987).  Accordingly, the Court

need not limit itself to the allegations of the Complaint in deciding a 12(b)(1) motion.  Instead,

"the Court may consider the complaint supplemented by undisputed facts evidenced in the record

... plus the court's resolution of disputed facts."  <u>Herbert v. National Acad. of Sciences</u>, 974 F.2d

192, 197 (D.C. Cir.1992).

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond

doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle

[her] to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  In making determinations on a

motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the complaint in the

light most favorable to the plaintiff.  Id.; see also Nix v. Hoke, 139 F.Supp.2d 125, 131 (D.D.C.

April 2001) (citing, Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001)),

and Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  In this case, Plaintiff fails to

establish a right to relief on the claims asserted, even when accepting the facts he alleges as true.

## III.    ARGUMENT

### A.    Applications For Adjustment Of Status

Section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255, authorizes USCIS

to adjust to permanent residence status certain aliens who have been admitted into the United

States.  Adjustment of status is subject to a favorable exercise of discretion.  Section 245(a)

provides:

> The status of an alien who was inspected and admitted or paroled
> into the United States . . . may be adjusted by the Attorney
> General, in his discretion and under such regulations as he may
> prescribe, to that of an alien lawfully admitted for permanent
> residence if (1) the alien makes an application for such adjustment,
> (2) the alien is eligible to receive an immigrant visa and is
> admissible to the United States for permanent residence, and (3) an
> immigrant visa is immediately available to him at the time of his
> application.

8 U.S.C. § 1255(a) (emphasis added).  Significantly, the statute does not set forth any time frame

in which a determination must be made whether to adjust an alien's status.

The procedures for admitted aliens to apply for adjustment of status are set forth at 8

C.F.R. § 245.  The regulations do not establish any time frame in which adjudication must occur.

Before a decision is rendered on an alien's I-485 application, USCIS, in conjunction with the

Federal Bureau of Investigation (FBI), conducts several forms of security and background

checks to ensure that the alien is eligible for the benefit and that he or she is not a risk to national

security or public safety.  These checks currently include:  (a) records checks against the

6

Department of Homeland Security's ("DHS") own immigration systems; (b) an FBI fingerprint check for relevant criminal history records on the alien; (c) a check against the Interagency Border Inspection System (IBIS), which is managed by DHS, and contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.  See 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

### B.     Venue Is Not Proper In The District Of Columbia.

The Court should determine that this case has an inadequate connection to Washington, D.C., because Plaintiff resides in Houston, Texas, and the USCIS office with jurisdiction over Plaintiff's pending adjustment application is located in Houston, Texas.  Plaintiff contends that venue is proper in Washington, D.C. solely because defendants  Department of Homeland Security (DHS), United States Citizenship and Naturalization Services (USCIS), and the Federal Bureau of Investigation (FBI) have headquarters in Washington, D.C.  See Plaintiff's Complaint at ¶ 4 ("Complaint").

Venue is proper in the District where: (1) the defendant resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; or (3) the plaintiff resides if no real property is involved in the action.  28 U.S.C. § 1391(e).  Courts investigate challenges to venue very closely when a plaintiff files suit in Washington, D.C. and the *only connection* to the District of Columbia is that named defendants are high government officials who reside there.

7

"Courts in [the District of Columbia] Circuit must examine challenges to . . . venue very carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia.  By naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere."  See Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993) (ruling Washington, D.C. was not the proper venue because (1) the acts and omissions occurred elsewhere; (2) the two appellees that had the most direct connection with the case were in Indiana and Kansas; and (3) the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Joyner v. District of Columbia, 267 F.Supp.2d 15, 20-21 (D.C. Cir. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants; and since the case had several connections to the Middle District of Pennsylvania, the case should be transferred).

The considerations listed above dictate that this case should be transferred to the Southern District of Texas.  Notably, jurisdiction over an application for adjustment of status lies in the USCIS district office where the applicant resides.  See 8 CFR § 245.2(a).  The adjudication of Plaintiff's application will occur in Houston, Texas, because Plaintiff has continually resided in the Houston, Texas, area.  This case is similar to Cameron and Joyner in that: (1) the acts and omissions occurred elsewhere, i.e., the decision whether to grant Plaintiff's application for adjustment of status will be made by federal officials in Houston; (2) the defendant with the strongest direct connection to the adjudication of Plaintiff's application is in the Southern District of Texas (the Houston USCIS office, which is responsible for adjudicating Plaintiff's application); and (3) relevant records are in Houston rather than Washington, D.C., which favors venue in the Southern District of Texas.  See Hudson Decl. at ¶ 6 and n.3.

8

**C.    The Court Should Transfer Venue To The Southern District Of Texas**

For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." See 28 U.S.C. § 1404(a).  A threshold question is whether the case could have been brought in the district to which transfer is sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  The Court must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness to decide if transfer is proper.  Id. at 29.  The moving party bears the burden to establish that it is proper to transfer the case.   See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).

The private interests of the parties include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). The public interest considerations include:  transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  Id.

Plaintiff should have initially brought this case in the Southern District of Texas.  Venue is proper in the district where:  (1) the defendant resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; or (3) the plaintiff resides if no real property is involved in the action.  See 28 U.S.C. § 1391(e).  Here, Plaintiff resides in the Southern District of Texas; and the principal Defendant, the Houston USCIS office, is in the Southern District of Texas.  Furthermore, the events or omissions giving rise to Plaintiff's claim occurred in the

9

Southern District of Texas.  USCIS adjudicates its applications for adjustment of status locally; therefore the delay in the processing of Plaintiff's application is a matter related to the Houston USCIS office.  Plaintiff admits this in his complaint.  See Complaint ¶¶ 10-14.

In sum, this case could have been brought in the district to which transfer is sought. While the Court must grant substantial deference to a plaintiff's choice of venue, this deference can be minimized.  For example, plaintiff's choice of venue is afforded less deference if the forum is not the plaintiff's home forum.  See  Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).  Deference is also minimized if the plaintiff's choice has an inadequate nexus to the events in the case.  Courts have held that there is an inadequate nexus if federal officials in Washington, D.C. were not involved in the decision-making process   See Shawnee Tribe v. United States, 298 F.Supp.2d at 24 (citing Trout Unlimited, 944 F.Supp. at 17.)   See also Sierra Club v. Flowers, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (holding that plaintiff's choice of forum, Washington, D.C., deserved little deference, because (1) federal officials in Washington, D.C. were not involved in the decision-making process that led up to the issuance of mining permits affecting the Lake Belt area of the Everglades; and (2) federal officials in Florida signed the final record of decision. Thus, the Court ruled that Washington, D.C. did not play an "active or significant" role in the decision to issue the permits.); The Wilderness Society v. Babbitt, 104 F.Supp.2d 10, 13-15 (D.D.C. 2000) (ruling that plaintiffs' choice of forum deserves substantial deference because (1) the Secretary of Interior, a federal official in Washington, D.C., was directly involved in the decision-making as evidenced by (a) the Secretary had involvement in the decision that was far from "routine;" (b) the Secretary signed the record of decision in Washington, D.C.; and (c) the Secretary briefed the public on his decision in Washington, D.C., (2) the environmental issue's

10

national scope, and (3) plaintiff's ties to the District of Columbia).

Plaintiff contends that venue is proper in Washington, D.C., because DHS, USCIS, and FBI are headquartered here. See Complaint ¶ 4. Plaintiff's reason for choosing Washington, D.C. is unknown.

This Court should grant little deference to Plaintiff's choice of forum for several reasons. As in Shawnee Tribe, the Defendants are seeking transfer to Plaintiff's home forum, the Southern District of Texas. In addition, Washington, D.C. has an insufficient connection with the events of this case. USCIS conducts all of its adjudication of family-based adjustment of status applications locally. As such, federal officials in Houston, Texas are responsible for the decision-making process, and the final decision regarding Plaintiff's pending adjustment application. See Hudson Decl. at ¶ 6. Even though the FBI conducts the (background) name check in Washington, D.C., the background name check is not initiated in Washington, D.C. The background name check is not monitored by USCIS in Washington, D.C., but rather in the USCIS district office with jurisdiction over the adjustment of status application. See id. at n.3. The decision-making process and final decision are conducted by local officials in Houston. See id. at ¶ 6. The FBI has a very "routine" role in Plaintiff's application - to conduct the (background) name check and simply send the results to the Houston USCIS office. See id. at n.3. Federal officials in Washington, D.C. do not play any adjudicative role in the decision whether or not to grant plaintiff's application for adjustment of status. Further, the Court in Sierra Club further held that the national significance of the Everglades does not tilt the balance in favor of keeping the forum in Washington, D.C., because the federal officials in Washington, D.C. did not have an active role in the decision to issue a permit. See 276 F.Supp. at 68. This case does not have national significance, therefore, the balance does not tilt towards keeping the

11

forum in Washington, D.C.

The Court next considers Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer this case. The Southern District of Texas is where Plaintiff resides and is the home jurisdiction of the Houston office of USCIS. The Houston office has jurisdictional connection to the case, since the USCIS Houston office is charged with and is responsible for adjudicating Plaintiff's pending adjustment application. See Hudson Decl. at ¶ 6. As Plaintiff acknowledges, the Houston USCIS office is responsible for the length of the delay in the processing of his application. See Complaint ¶¶ 12, 15 (complaining that Defendant USCIS Houston's refusal to act on the application is arbitrary and not in accordance with the law."). Since this case arose in the Southern District of Texas, there is local interest in resolving it there. See Schmidt v. American Institute of Physics, 322 F.Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise.)

Moreover, the Southern District of Texas is a significantly more convenient jurisdiction to litigate this case. As stated above, Plaintiff resides in Texas. Clearly, it is more convenient to litigate this case in Plaintiff's home forum, rather than having to travel to Washington, D.C. In addition, the Houston USCIS office is responsible for the adjudication of Plaintiff's pending adjustment application. As such: (1) the people involved in making the determination as to Plaintiff's application are located in Houston; and (2) documents or records related to the case are all located in Houston. See Hudson Decl. at ¶ 6.

Since this action concerns federal law, the Southern District of Texas is as familiar with the applicable law as the District of Columbia. In addition, there is no evidence that the Southern District of Texas's docket is more congested than the District of Columbia's docket. See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16. Both factors

12

weigh in favor of the Court transferring this case to the Southern District of Texas.

**D.    Alternatively, Plaintiff's Claim Is Barred**

Plaintiff contends that subject matter jurisdiction exists in this action under 28 U.S.C. §§ 1331, 1361, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq. Defendant respectfully disagrees. The cited statutory provisions fail to provide a basis for subject matter jurisdiction over Plaintiff's claim. Specifically, the Court lacks subject matter jurisdiction because:

(1) The INA divests courts of jurisdiction over suits where, as here, the Plaintiff seeks judicial review of either an agency's discretionary decision or action, INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

(2) The INA bars judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action" of the agency to "commence proceedings, adjudicate cases, or execute removal orders," INA § 242(g), 8 U.S.C. §§ 1252(a)(2)(B)(ii), (g).

(3) Mandamus is a remedy, once jurisdiction is properly invoked, not a basis for jurisdiction. Further, mandamus may not issue here because the Plaintiff lacks a clear right to an immediate adjudication of the application to adjust status, and Defendant owes no clear duty to adjudicate the adjustment application prior to the completion of background checks for criminal convictions, immigration fraud, and national security matters.

(4) The Administrative Procedure Act does not provide an independent basis for subject matter jurisdiction to review agency action, but its waiver of sovereign immunity must be coupled with another basis for jurisdiction, such as 28 U.S.C. § 1331. Further, the APA precludes judicial review of agency's discretionary decisions.

**E.    Plaintiff's Complaint Should Be Dismissed Under Rule 12(b)(1) because INA**

13

**§ 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii), and INA § 242(g), 8 U.S.C. § 1252(g), Each Independently Divest this Court of Jurisdiction.**

    1.    INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

The INA contains an express jurisdiction-stripping provision where a litigant seeks review of an adjustment case or any other discretionary decision. In a subsection entitled "Matters not subject to judicial review," INA § 242(a)(2)(B) provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), section 2241 of title 28, United States Code, . . . and sections 1361 and 1641 of such title, and . . . regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review:
>
> (I)    any judgment regarding the granting of relief under section 212(h), 212(I), 240A, 240B, or 245 [8 U.S.C. § 1255], or
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added). See Zhu v. Gonzales, 411 F.3d 292 (Cir. D.C. 2005); Mustafa v. Pasquerell, 2006 WL 488399 (W.D. Tex. Jan 10, 2006); Zahini v. Neufeld, 2006 WL 2246211 (M.D. Fla. June 26, 2006); Blacher v. Ridge, 436 F. Supp.2d 602 (S.D.N.Y. 2006). Because the adjudication of an adjustment of status application is expressly committed to the discretion of the Secretary of Homeland Security, 8 U.S.C. § 1252(a)(2)(B)(ii) divests this Court of subject matter jurisdiction. Under 8 U.S.C. § 1252(a)(2)(B)(ii), courts are barred from reviewing any "decision or action" the authority for which is specified as discretionary under "this title." In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Plaintiff's claim falls squarely within the plain meaning of these terms. First, "this title" refers to Title II of the INA, which is comprised of INA §§ 201 - 294, 8 U.S.C. §§ 1151 through 1363a, i.e. all INA sections in the 200 series. Thus, section 245(a), 8 U.S.C.

14

§1255(a), which grants discretionary authority to adjudicate adjustment of status applications, is part of Subchapter II.

Second, under INA 245(a), 8 U.S.C. § 1255(a), the "authority" for adjudicating adjustment of status applications is discretionary.  INA § 245(a), 8 U.S.C. § 1255(a) (emphasis added), provides:

> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion, and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

INA § 1255(a) "vests USCIS with discretion over the *entire* process of adjustment application adjudication.  As such, § 1252(a)(2)(B)(ii) precludes judicial review of any 'action,' meaning any act or series of acts, included within the ongoing adjudication process and the pace at which that action proceeds."  Safadi v. Howard, 466 F.Supp.2d 696, 700 (E.D.Va. 2006)(emphasis in original) (nearly 4 years had passed in processing plaintiff's pending application for adjustment of status); accord Wilkinson-Okotie v. U.S. Dept. of Homeland Security, 2006 WL 2792405 at 3 (S.D. Tex. Sept. 26, 2006)("Discretionary decisions involving applications for adjustment of status under 8 U.S.C. § 1255 are expressly included within the jurisdiction-stripping provision found in § 1252(a)(2)(B)(I)."); Khalifa v. USCIS, 2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)(the adjustment statute, 8 U.S.C. § 1255, "expressly places the adjustment of immigration status within the 'discretion' of the Attorney General,'").

The Supreme Court has also determined that "adjustment of status," through which an alien in the United States may apply for permanent resident status, "is a matter of grace, not

15

right...." <u>Elkins v. Moreno</u>, 435 U.S. 647, 667 (1978).  <u>See also</u> <u>Wallace v. Gonzales</u>, 463 F.3d 135, 136 (2nd Cir. 2006).  Absent "adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."  <u>Elkins v. Moreno</u>, at 667 (quoting <u>Matter of Arai</u>, 13 I. & N. Dec. 494, 496 (1970)) (emphasis altered).  <u>See also</u>, <u>Daud v. Gonzales</u>, 2006 WL 347712 at 8 (3rd Cir. Dec. 5, 2006) ("The decision to grant or deny an adjustment of status pursuant to § 1255 is a discretionary one . . . [t]herefore we are without jurisdiction to review Daud's challenge to the BIA's denial of discretionary relief . . .").

Plaintiff is also seeking judicial review of both an agency decision and agency action. USCIS has  made a decision that it cannot immediately adjudicate Plaintiff's application because the background checks are incomplete, and has acted to withhold adjudication of the adjustment application until these checks have cleared.  The <u>Safadi</u> Court stated that "under § 1252(a)(2)(B)(ii) the term 'action' encompasses *any* act or series of acts that are discretionary within the adjustment of status process."  466 F.Supp.2d at 699 (emphasis in original).  Since "§ 1255(a) does not impose any limits on USCIS's discretionary authority over the adjustment of status process, it is clear that 'action' in § 1252(a)(2)(B)(ii) encompasses the entire process of reviewing an adjustment application, including the completion of background and security checks and the pace at which the process proceeds." <u>Id.</u>  The pertinent regulations support the USCIS's discretionary decision to withhold adjudication until the completion of the necessary background checks, to ensure the alien's eligibility for adjustment of status or other immigration benefit.  8 C.F.R. § 103.2(b)(7); 8 C.F.R. § 103.2(b)(18).  <u>See</u> <u>Zahani v. Neufeld</u>, 2006 WL 2246211 at 2 (M.D. Fla. June 26, 2006) (8 C.F.R. § 103.2(b)(18) "provides USCIS with discretion to withhold adjudication of the adjustment of status application."); <u>Khalifa v. USCIS</u>, 2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)("USCIS' authority under 8 C.F.R. §

16

103.2(b)(18) "to withhold adjudication is a decision solely within the discretion of USCIS.").

The regulations clearly afford "wide discretion to [USCIS] in matters pertaining to the timing of the adjudication of petitions." Mustafa v. Pasquerell, 2006 WL 488399, *4 (W.D. Tex. 2006) citing, Willis-Gomez v. Meissner, 879 F.Supp. 1120, 1123-24 (W.D. Okla. 1995). The investigative process employed for adjustment of status applicants involves agencies outside of USCIS's control, such as the FBI, and is crucial for the integrity of the immigration laws and the safety of the United States. These background checks are designed to prevent granting benefits to aliens who are ineligible due to criminal history, immigration fraud, or threat to national security. Alkenani v. Barrows, 356 F.Supp.2d 652, 657 (N.D. Tex. 2005) (" Nor does the immigration service have authority to expedite the FBI investigation or give petitioner priority over background checks requested by other agencies. Unfortunately, delays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world."). Furthermore, "judicial deference to the Executive Branch is especially appropriate in the immigration context." INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). A mandamus action simply cannot be used to compel the performance of a discretionary act. Kale v. INS, 37 Fed. Appx. 90; 2002 WL 1022012 (C.A.5 (Tex.)) at *2 .

In sum, because USCIS's decision to continue evaluating Plaintiff's application lie within the discretion of the Attorney General under § 1255(a), this Court lacks subject matter jurisdiction over Plaintiff's claims. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of

17

classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

Congress's specific withdrawal of subject matter jurisdiction from this Court defeats Plaintiff's assertion of general federal question jurisdiction under 28 U.S.C. § 1331 and mandamus jurisdiction under 28 U.S.C. § 1361.  See Danilov v. Aguirre, 370 F.Supp.2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction.").  Indeed, § 1252(a)(2)(B) expressly states that it applies "notwithstanding . . . [28 U.S.C. §] 1361," and the APA explicitly provides that it does not apply where "statutes preclude judicial review."  5 U.S.C. § 701(a)(2).  Because the Court lacks subject matter jurisdiction over this action, Plaintiff's complaint should be dismissed in its entirety pursuant to Rule 12(b)(1).

b. INA 242(g), 8 U.S.C. § 1252(g).

In addition, INA § 242(g), 8 U.S.C. § 1252(g) bars judicial review in this case.  INA § 242(g) provides that "notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act."  In this way, Congress has evinced its intent to protect the agency from actions that interfere with the prioritizing and adjudication of immigration cases. Congress intended Section 242(g) to provide some measure of protection to "discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." Reno v. American-Arab Anti-Discrimination Comm, 525 U.S. 471, 485 (1999).

18

Indeed, litigation would be piecemeal and burdensome if an applicant for adjustment could: (1) initially challenge the pace at which USCIS processed the application; then (2) challenge the denial itself in federal court; (3) raise the adjustment application for review before an immigration judge in conjunction with removal proceedings; (4) appeal any denial to the Board of Immigration Appeals; and (5) litigate the adjustment issue again before the Court of Appeals. Delay is a goal in and of itself for many immigration litigants, as it affords residence in the United States. Oftentimes, successive litigation is the means of choice in achieving this goal.

> 2. The Plaintiff's Request for Mandamus Under 28 U.S.C. §1361 Fails because the Defendant does not Owe a Clear, Nondiscretionary Duty to Process the Adjustment of Status Application Prior to Completion of Background Checks or at any Particular Pace.

Even assuming arguendo, that the jurisdiction stripping provisions of INA § 242 do not apply, the mandamus statute does not confer subject matter jurisdiction. The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Heckler v. Ringer, 466 U.S. 602, 616 (1984). Mandamus relief is "a drastic one, to be invoked only in extraordinary situations." Kerr v. United States District Court, 426 U.S. 394, 402 (1976); see also, Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980); Giddings v. Chandler, 979 F.2d 1104, 1008 (5th Cir. 1992). Mandamus is available only when a government agent or agency has a duty to perform a specific act. The duty must be plainly defined, non-discretionary, and free from doubt; the act must be purely ministerial. Id. An aggrieved

party may not sue a federal agency when the agency action in question is committed to its discretion by law.  See 5 U.S.C. § 701(a)(2).

Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980); Will v. United States, 389 U.S. 90, 95 (1967); Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382-385 (1953).  A writ of mandamus may only issue if three elements are met: "(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available."  In re First Federal Sav. & Loan Ass'n of Durham, 860 F.2d 135, 138 (4th Cir. 1988).  Accord Rios v. Ziglar, 398 F.3d 1201, 1206 (10th Cir.2005); Nyaga v. Aschcroft, 323 F.3d 906, 911 (11th Cir. 2003).  As the Supreme Court has explained, the plaintiff's right to the relief sought must be "clear and indisputable," Allied Chemical, 449 U.S. at 35, and the defendant must owe the plaintiff "a clear non-discretionary duty."  Heckler v. Ringer, 466 U.S. at 616-17 (1984); see also In re First Federal Sav. & Loan, 860 F.2d at 138 ("Mandamus against a public official will not lie unless the alleged duty to act involves a mandatory or ministerial obligation which is so plainly prescribed as to be free of doubt.").

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendant has no clear mandatory or ministerial obligation to adjudicate the application within a particular time frame.  Safadi v. Howard, 466 F.Supp.2d at 700.  The decision whether to grant or deny Plaintiff's adjustment application is plainly discretionary by statute.  See 8 U.S.C. § 1255(a).  Surely, part of USCIS's discretion in adjudicating an adjustment application includes ensuring that immigration benefits are not conferred to an alien ineligible for a benefit due to fraud, criminal

20

convictions, or national security matters, and determining when the background checks are satisfactorily complete. Accordingly, there are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame. Consequently, USCIS has no clear, mandatory duty to adjudicate Plaintiff's application prior to completion of background checks in order to meet a prescribed deadline.

For these reasons, district courts have routinely found that mandamus relief is unavailable to compel immediate adjudication of applications for adjustment of status. <u>Safadi v. Howard</u>, 466 F.Supp.2d at 700; <u>Saleh v. Ridge</u>, 367 F.Supp.2d 508, 511 (S.D.N.Y. 2005) ("The Court therefore lacks subject matter jurisdiction to compel agency action by writ of mandamus in this case."); <u>Karan v. McElroy</u>, No. 02 Civ. 6678(JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003) ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the mandamus statute. . . to grant the relief the plaintiff seeks."); <u>Zheng v. Reno</u>, 166 F.Supp.2d 875, 880-81 (S.D.N.Y. 2001); <u>Sadowski v. INS</u>, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000); <u>see also</u> <u>Rahman v. McElroy</u>, 884 F.Supp. 782, 787 (S.D.N.Y. 1995). As the district court in <u>Saleh</u> noted, "[a]djustment of immigration status . . . is a discretionary act, and therefore, [i]n keeping with the plain language [of 8 U.S.C. § 1255(a)], courts have consistently found mandamus inappropriate in actions based on the government's failure to adjust an applicant's status." <u>Saleh</u>, 367 F.Supp.2d at 508 (brackets original, internal quotation marks omitted).

In sum, because the timing of the adjudication of Plaintiff's adjustment of status application is not "subject to positive command, plainly described and free from doubt," Plaintiff is not entitled to the extraordinary relief of mandamus. <u>Rahman</u>, 884 F.Supp. at 787. The Court thus lacks subject matter jurisdiction to issue the writ.

21

3.     The APA Precludes This Court From Reviewing Plaintiff's Claim Because it Concerns Action that is Committed to Agency Discretion.

The APA does not, however, entitle a person "adversely affected or aggrieved by agency action" to judicial review, see § 702, where another statute precludes judicial review or "agency action is committed to agency discretion by law." See § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  "The principle purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with his lawful discretion . . . ." Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).  Here, § 701(a)(2) precludes judicial review over Plaintiff's claims because the adjudication of  I-485 adjustment applications is committed to agency discretion.  See Safadi v. Howard, 466 F.Supp.2d at 700.

The APA itself does not confer jurisdiction on a district court to review the decision of an administrative agency.  Califano v. Sanders, 430 U.S. 99, 107 (1977).  However, a district court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA, if the claim is not "wholly insubstantial and frivolous" or "patently without merit." Bell v. Hood, 327 U.S. 678, 682-84 (1946).

Even where subject matter jurisdiction to review an APA claim exists, however, a claim is nevertheless unreviewable by the courts if the relevant agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  "Agency action" is defined under the APA to include a "failure to act." 5 U.S.C. § 551(13).  In Heckler v. Chaney, supra, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830.  As the Court went on to explain, "if no judicially manageable standards

22

are available for judging how and when an agency should exercise its discretion, then it is

impossible to evaluate agency action for 'abuse of discretion.'" Id.; see also Collins Music Co. v.

United States, 21 F.3d 1330, 1335 (4th Cir. 1994).

As explained above, the adjudication of an adjustment of status application is expressly

committed to agency discretion. See 8 U.S.C. § 1255(a) (an alien's status "may be adjusted by

the Attorney General, in his discretion and under such regulations as he may prescribe")

(emphasis added). Moreover, no statutory or regulatory provisions provide a "meaningful

standard" against which to measure USCIS's process of adjudicating such an application.

Heckler, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine, not

only whether to adjudicate the adjustment application, but also "how and when" to do so. Id. In

contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b) (requiring

adjudication of naturalization applications 120 days after examination), the statute and

regulations governing Plaintiff's adjustment of status application provide no time frame for when

such an application must be adjudicated. See Zheng v. Reno, 166 F.Supp.2d at 879 ("[T]here is

no requirement that the application be decided within a specific period of time[.]").

Consequently, there is no standard against which the Court can measure whether the Agency has

acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id.

§ 706(1).

In the absence of a specified time frame for adjudication, other courts have found that

claims relating to alleged delays in the process of adjudicating an adjustment of status

application are unreviewable under the APA. See Zheng, 166 F.Supp.2d at 878-89; Karan v.

McElroy, supra, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are

committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant

23

the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. at 787-88.   In

addition, at least two Supreme Court cases suggest the importance of a specified time period in

allowing a court to compel agency action that is "unreasonably delayed" under § 706(1).  See

Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 65 ("Thus, when an agency is

compelled by law to act within a certain time period . . . a court can compel the agency to act . . .

."); Brock v. Pierce County, 476 U.S. at 260 n.7 (finding that because "the statutory command

that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's

discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully

withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has

"unreasonably delayed" adjudication of his application, this Court would have to create a

temporal standard out of whole cloth.  This is a perilous task given the national security

considerations that affect USCIS's adjudicative process.  Moreover, as other courts have

cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to

intervene, the judicial creation of such a duty would have the potential for mischievous

interference with the functioning of already overburdened administrative agencies.'" Rahman,

884 F.Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see

also Heckler v. Chaney, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than

the courts to deal with the many variables involved in the proper ordering of its priorities").

Accordingly, the Court should find that 8 U.S.C. § 701(a)(2) precludes review of the

agency's adjudicative process, because it is committed to agency discretion by law.

Moreover, Plaintiff has available administrative remedies to seek redress if the

application is denied.  As federal regulations make clear: "[n]o appeal lies from the denial of an

24

application by the director, but the applicant, if not an arriving alien, retains the right to renew

his or her application in proceedings under 8 C.F.R. § 245.2(a)(1) [i.e., removal proceedings].

8 C.F.R. § 245.2(a)(5)(ii).  See also AUSTIN T. FRAGOMEN, JR., ET AL., IMMIGRATION

PROCEDURES HANDBOOK 13-91 (1999) ("There is no direct appeal from [an adjustment of

status] denial. . . . If the alien believes that the adjustment application was wrongly denied, he or

she has the right to reapply for adjustment of status as a part of deportation proceedings brought

against him or her by the INS [and thereafter the] alien has a right to appeal the denial of an

adjustment application when . . . made during a removal proceeding.").

Even if 5 U.S.C. § 555(b) (requiring agency action within a reasonable time) can be

construed as a statute that renders Defendants' actions reviewable under § 1331, the Complaint

is devoid of factual allegations that demonstrate unreasonable delay in acting upon Plaintiff's

application.  See Uckan v. Chertoff, No. 3:05-CV-2502-P (N.D. Tex. December 19, 2006)

(holding that four years is not an unreasonable delay for a pending naturalization application

awaiting completion of a background check); Safadi v. Howard, supra at 700-01 (nearly four

year delay was not so unreasonable as to be tantamount to a refusal to process the application);

Jabr v. Chertoff, 2006 WL 3392504 (E.D. Mo. Nov. 21, 2006)(more than two years since

adjustment application filed).  While Plaintiff would like immediate adjudication of the

application, there is no statutory support warranting such relief.  Therefore, should the Court find

that 5 U.S.C. §555(b) confers subject matter jurisdiction over this matter, dismissal is proper for

failure to state a claim under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court transfer venue

to Houston, Texas, where Plaintiff resides and where the adjustment of status application is

pending before Defendant USCIS Houston District Office.  In the alternative, Defendants

request that the Court dismiss this case for lack of subject matter jurisdiction pursuant to Rule

12(b)(1) and/or for failure to state a claim pursuant to Rule 12(b)(6).

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____
KAREN L. MELNIK, D.C. Bar #436452
Assistant United States Attorney
555 4th Street, N.W. Rm. E 4112
Washington, D.C. 20530

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MOHAMMAD FAYYAZ and** | ) |
| **GIZELA FAYYAZ,** | ) |
| | ) |
|     **Plaintiffs,** | ) |
| | ) |
|     **v.** | ) |
| | )    **CIVIL ACTION NO. 06cv2016 (HHK)** |
| **DEPARTMENT OF HOMELAND** | ) |
| **SECURITY, through its Secretary,** | ) |
| **MICHAEL CHERTOFF; EMILIO** | ) |
| **GONZALEZ, Director, UNITED** | ) |
| **STATES CITIZENSHIP AND** | ) |
| **IMMIGRATION SERVICES (USCIS);** | ) |
| **SHARON HUDSON, District Director,** | ) |
| **USCIS Houston; and ROBERT** | ) |
| **MUELLER, Director, FEDERAL** | ) |
| **BUREAU OF INVESTIGATION (FBI),** | ) |
| | ) |
|     **Defendants.** | ) |

**ORDER**

UPON CONSIDERATION of Defendants' motion to transfer or, in the alternative, to

dismiss, and the entire record herein, it is this ___ day of _____, 2007, hereby

ORDERED, that Defendants' motion to transfer is hereby GRANTED; and it is

FURTHER ORDERED, that this case is transferred to the Southern District of

Texas/dismissed with prejudice.


_____
UNITED STATES DISTRICT JUDGE

Copies of this Order to:

Karen L. Melnik
Assistant U.S. Attorney
Judiciary Building
555 Fourth Street, N.W., Rm. E-4112
Washington, D.C.  20530

James P. McCollom, Jr.
3D/International Tower
1900 West Loop South
Suite 820
Houston, Texas 77027-3206

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD FAYYAZ and GIZELA FAYYAZ, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. |
| DEPARTMENT OF HOMELAND SECURITY, through its Secretary, MICHAEL CHERTOFF; EMILIO GONZALEZ, Director, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (USCIS); SHARON HUDSON, District Director, USCIS Houston; and ROBERT MUELLER, Director, FEDERAL BUREAU OF INVESTIGATION (FBI), | ) ) ) ) ) ) ) ) ) ) ) ) | 06cv02016 (HHK) |
| Defendants. | ) | |

## DECLARATION OF SHARON A. HUDSON

I, Sharon A. Hudson, declare as follows:

(1)        I am the District Director of the Houston, Texas, office of the United States

Citizenship and Immigration Services (USCIS) in the Department of Homeland Security

(DHS). I oversee the adjudication of all applications for benefits including applications

for adjustment of status. I have held the position of District Director since March 31,

2005. As part of my duties, I am responsible to oversee and ensure that the USCIS

applicants for benefits including adjustment of status meet the statutory and regulatory

prerequisites to permit approval of all benefits applications handled by the USCIS

Houston District office. Prior to my appointment as District Director, I held various

supervisory positions within the former Immigration and Naturalization Service over the

last 33 years beginning in 1973. Among other appointments, I served as a Supervisory

District Adjudications Officer, a Regional Adjudications Officer and a Senior Adjudications Officer at the District level, the Regional Office, and in Headquarters. I make this Declaration based upon personal knowledge and information made known to me in the course of my professional duties.

(2)        When a foreign national applies to USCIS for various benefits under immigration law, USCIS conducts several forms of mandatory criminal and national security background checks to ensure that the alien is eligible for the benefit and that he or she is not a risk to national security or public safety. Such mandatory criminal and national security background checks are specifically required as part of an application for adjustment of status to lawful permanent resident.

(3)        Specifically, USCIS is required to conduct the following background investigation: (a) a record check of the alien made against the Department of Homeland Security's (DHS) internal immigration system; (b) a Federal Bureau of Investigation (FBI) fingerprint check[1] for relevant criminal history, arrests, and convictions; (c) a check against the DHS-managed Interagency Border Inspection System (IBIS)[2], which contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, including the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, the Department of State, DHS/U.S. Customs and Border Protection (USCBP), and other DHS agencies; IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity; and (d) an FBI name check, which the FBI runs against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

(4)        In the past, these law enforcement checks have revealed significant derogatory information on various applicants. In many instances, the disqualifying

---

[1] The FBI fingerprint check remains valid for a fifteen month period.
[2] The IBIS check remains valid for a 180 day period.

2

information on the alien has been discovered as a result of the IBIS or FBI name checks, rather than through an immigration database or fingerprint check alone.

(5)     In some instances, USCIS will receive a "positive" response from the FBI name check. Any "positive" name check response must be favorably resolved before an application for adjustment of status can be approved.

(6)     Mr. Mohammad Fayyaz resides in the jurisdiction of the USCIS Houston, Texas, District Office, for which I am the District Director. His USCIS administrative file, A 99-143-922, is located in this office. The adjudication of his pending adjustment of status application falls within the adjudication functions of this office, unless he moves to a different USCIS jurisdiction.

(7)     I have reviewed Mr. Mohammad Fayyaz's USCIS administrative file, which reveals the following chronological facts, as evidenced by the attached Forms I-130 visa petition (Ex. A-1) and I-485 application to adjust status (Ex. A-2) attached hereto:

(a)     On October 5, 1977, Mr. Fayyaz was born in Pakistan;
(b)     On December 22, 2002, he was admitted to the United States as a nonimmigrant F-1 student;
(c)     On November 14, 2003, he married a United States citizen spouse;
(d)     On June 29, 2004, Mr. Fayyaz and his spouse filed a Form I-130 visa petition and a Form I-485 application to adjust status to lawful permanent resident (Exs. A-1 and A-2);
(e)     USCIS commenced the mandatory criminal and national security background checks, including the FBI name check on July 5, 2004[3];
(f)     On February 10, 2005, a USCIS Houston District Adjudications Officer interviewed Mr. Fayyaz and his spouse;
(g)     On February 10, 2005, USCIS approved the I-130 visa petition (Ex. A-1);
(h)     Since that interview, USCIS has been unable to complete adjudication of the adjustment of status application because the mandatory FBI name check remains pending as of the date of this Declaration.

(8)     The FBI name check process is detailed and set forth both on the USCIS and FBI public websites. See USCIS 4/25/06 Fact Sheet, at

---

[3] The FBI name check is conducted in Washington, D.C. but the results are ultimately forwarded to the USCIS Houston, Texas, District Office as part of the overall local adjudication of the application for adjustment of status.

http://www.uscis.gov/graphics/publicaffairs/factsheets/security_checks_42506.pd
f, copy attached hereto as Exhibit A-3; see also, FBI National Name Check Program-
Frequently Asked Questions, at http://www.fbi.gov/page2/nationalnamecheck.htm,
attached hereto as Exhibit A-4. These documents clearly set forth the security checks
that USCIS must complete prior to approval of any application. These fact sheets
demonstrate that, although the vast majority clear quite quickly, FBI name checks can
remain pending on applicants for longer periods of time, but that such delays involve
only approximately one percent of the USCIS applications received each year.

(9)        USCIS is mandated to perform and await favorable completion of the national
security FBI name check and is mandated to have all background checks current and
favorably resolved prior to approval of any application. See August 4, 2004, USCIS
Memorandum entitled "Required Security Checks", attached hereto as Ex. A-5; see also
Public Law 103-317, 108 Stat. 1724, Aug. 26, 1994, which in part amended 8 U.S.C. §
1255, by mandating that "The Immigration and Naturalization Service shall conduct full
fingerprint identification checks through the Federal Bureau of Investigation for all
individuals over sixteen years of age adjusting immigration status in the United States
pursuant to this section."

(10)       Houston USCIS monitors all pending FBI name check cases weekly. Once
USCIS receives the FBI name check clearance, presuming the name check clears with no
possibly derogatory information, USCIS will also be required to ensure that Mr. Fayyaz's
fingerprint results have not expired and will be required to update the IBIS background
checks which have expired, prior to approving the application for adjustment of status or
issuing a lawful permanent resident card.

(11)       If, on the other hand, USCIS receives any derogatory information as a result
of the FBI name check, USCIS is mandated to investigate and resolve that derogatory
information prior to completion of the application adjudication.

(12)       Since the terrorist attacks of September 11, 2001, the need to conduct more
rigorous and thorough background checks on aliens who are seeking immigration

4

benefits has required procedures that sometimes result in individuals not receiving a response to their application as quickly as in the past. However, the law and public safety requires USCIS to make certain that the checks have been done before it adjudicates and approves an application to ensure the applicant's eligibility for the benefit.

Pursuant to 28 USC § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed in Houston, Texas, on this 16th day of February, 2007.

Sharon A. Hudson
District Director
USCIS, Houston, Texas

5

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB #1115-0054

**Petition for Alien Relative**

| DO NOT WRITE IN THIS BLOCK - FOR EXAMINING | |
|---|---|
| A# 99 143 922 | Action Stamp | Fee |

**Section of Law/Visa Category**

- [X] 201(b) Spouse - IR-1/CR-1
- [ ] 201(b) Child - IR-2/CR-2
- [ ] 201(b) Parent - IR-5
- [ ] 203(a)(1) Unm. S or D - F1-1
- [ ] 203(a)(2)(A) Spouse - F2-1
- [ ] 203(a)(2)(A) Child - F2-2
- [ ] 203(a)(2)(B) Unm. S or D - F2-4
- [ ] 203(a)(3) Married S or D - F3-1
- [ ] 203(a)(4) Brother/Sister - F4-1

APPROVED

FEB 1 0 2005

Retained ...........
HOU            9897

MSC-04-273-21757    06/29/2004

Petition was filed on: _____ (priority date)
- [ ] Personal Interview            [ ] Previously Forwarded
- [X] Pet. [X] Ben "A" File Reviewed  [ ] I-485 Filed Simultaneously
- [ ] Field Investigation           [ ] 204(g) Resolved
- [ ] 203(a)(2)(A) Resolved          [ ] 203(g) Resolved

Remarks:

2004 JUN 29 PM 8: 48

**A. Relationship**    You are the petitioner; your relative is the beneficiary.

| 1. I am filing this petition for my: | 2. Are you related by adoption? | 3. Did you gain permanent residence through adoption? |
|---|---|---|
| [X] Husband/Wife [ ] Parent [ ] Brother/Sister [ ] Child | [ ] Yes [X] No | [ ] Yes [X] No |

**B. Information about you**

**C. Information about your relative**

| B. 1. Name (Family Name in CAPS) (First) (Middle) | C. 1. Name (Family Name in CAPS) (First) (Middle) |
|---|---|
| FAYYAZ  Gizela  Rodriguez | FAYYAZ  Mohammad |

| 2. Address (Number and Street) (Apt. No.) | 2. Address (Number and Street) (Apt. No.) |
|---|---|
| 794 Normandy, # 1418 | 794 Normandy #1418 |

| (Town or City) (State/Country) (ZIP/Postal Code) | (Town or City) (State/Country) (ZIP/Postal Code) |
|---|---|
| Houston  Texas/USA  77015 | Houston  Texas/USA  77015 |

| 3. Place of Birth (Town or City) (State/Country) | 3. Place of Birth (Town or City) (State/Country) |
|---|---|
| Brownsville, TX/USA | Peshawar  Pakistan |

| 4. Date of Birth (Month/Day/Year) | 5. Gender | 6. Marital Status | 4. Date of Birth (Month/Day/Year) | 5. Gender | 6. Marital Status |
|---|---|---|---|---|---|
| 08/07/1978 | [ ] Male [X] Female | [X] Married [ ] Single [ ] Widowed [ ] Divorced | 10/05/1977 | [X] Male [ ] Female | [X] Married [ ] Single [ ] Widowed [ ] Divorced |

| 7. Other Names Used (including maiden name) | 7. Other Names Used (including maiden name) |
|---|---|
| RODRIGUEZ Gizela, GONZALEZ, Gizela | FAYYAZ, Mohammad Khattak/Mohammad Khattah |

| 8. Date and Place of Present Marriage (if married) | 8. Date and Place of Present Marriage (if married) |
|---|---|
| 11/14/2003  Houston, Texas | 11/14/2003  Houston, TX |

| 9. Social Security Number (if any) | 10. Alien Registration Number | 9. Social Security Number (if any) | 10. Alien Registration Number |
|---|---|---|---|
| ████████ | N/A | ████████ | None 99 143 922 |

| 11. Name(s) of Prior Husband(s)/Wive(s) | 12. Date(s) Marriage(s) Ended | 11. Name(s) of Prior Husband(s)/Wive(s) | 12. Date(s) Marriage(s) Ended |
|---|---|---|---|
| Lorenzo GONZALEZ | 02/15/1999 | None | |

**13. If you are a U.S. citizen, complete the following:**

My citizenship was acquired through (check one):
- [X] Birth in the U.S.
- [ ] Naturalization. Give certificate number, date and place of issuance.
  N/A
- [ ] Parents. Have you obtained a certificate of citizenship in your own name?
  [ ] Yes. Give certificate number, date and place of issuance. [ ] No.
  N/A

**14a.** If you are a lawful permanent resident alien, complete the following: Date and place of admission for, or adjustment to, lawful permanent residence and class of admission.

N/A

**14b.** Did you gain permanent resident status through marriage to a United States citizen or lawful permanent resident?
[ ] Yes [X] No

**13. Has your relative ever been in the U.S.?** [X] Yes [ ] No

**14.** If your relative is currently in the U.S., complete the following:
He or she last arrived as a: F1
(visitor, student, stowaway, without inspection, etc.)

| Arrival/Departure Record (I-94) | Date arrived (Month/Day/Year) |
|---|---|
| 60713718107 | 12/22/2002 |

Date authorized stay expired, or will expire, as shown on Form I-94 or I-95  D/S

**15.** Name and address of present employer (if any)
Getronics    9089 West Loop South, Houston, TX
Date this employment began (Month/Day/Year)
June 2000

**16.** Has your relative ever been under immigration proceedings?
[X] No [ ] Yes  Where _____ When _____
[ ] Removal [ ] Exclusion/Deportation [ ] Rescission [ ] Judicial Proceedings

| INITIAL RECEIPT | RESUBMITTED | RELOCATED: Rec'd | Sent | COMPLETED: Appv'd | Denied | Ret'd |
|---|---|---|---|---|---|---|

Form I-130 (Rev. 06/05/02) Y

JUN 2 2 2004    Ex. A-1

## C. Information about your relative (continued)

**17. List husband/wife and all children of your relative.**

| (Name) | | (Relationship) | (Date of Birth) | (Country of Birth) |
|--------|--------|--------|--------|--------|
| Gizela | FAYYAZ | Wife | 08/07/1978 | USA |
| Lorenzo | GONZALES | Step-son | 06/14/1996 | USA |
| Rosalinda | GONZALES | StepDaughter | 06/30/1997 | USA |
| | | | | |
| | | | | |

**18. Address in the United States where your relative intends to live.**

| (Street Address) | (Town or City) | (State) |
|--------|--------|--------|
| 794 Normandy 1418 | Houston | Texas |

**19. Your relative's address abroad** (Include street, city, province and country)

| | | Phone Number (if any) |
|--------|--------|--------|
| Village Po Khawari, Nowshea District | Peshawar, Pakistan | |

**20. If your relative's native alphabet is other than Roman letters, write his or her name and foreign address in the native alphabet.**

(Name)                Address (Include street, city, province and country):

ده ٔ؟؟؟ ؟؟؟

**21. If filing for your husband/wife, give last address at which you lived together.** (Include street, city, province, if any, and country):

| | From: (Month) (Year) | To: (Month) (Year) |
|--------|--------|--------|
| 794 Normandy 1418, Houston, Texas 77015 | 11/2003 | Present |

**22. Complete the information below if your relative is in the United States and will apply for adjustment of status.**

Your relative is in the United States and will apply for adjustment of status to that of a lawful permanent resident in the office of the Immigration and Naturalization Service in  Houston        Texas       . If your relative is not eligible for adjustment of status, he or she
                  (City)      (State)

will apply for a visa abroad at the American consular post in _____
                                (City)             (Country)

NOTE: Designation of an American embassy or consulate outside the country of your relative's last residence does not guarantee acceptance for processing by that post. Acceptance is at the discretion of the designated embassy or consulate.

## D. Other information

**1. If separate petitions are also being submitted for other relatives, give names of each and relationship.**

None

**2. Have you ever filed a petition for this or any other alien before?**  ☐ Yes  ☒ No
If "Yes", give name, place and date of filing and result.

N/A

**WARNING:** INS investigates claimed relationships and verifies the validity of documents. INS seeks criminal prosecutions when family relationships are falsified to obtain visas.

**PENALTIES:** By law, you may be imprisoned for not more than five years or fined $250,000, or both, for entering into a marriage contract for the purpose of evading any provision of the immigration laws. In addition, you may be fined up to $10,000 or imprisoned up to five years, or both, for knowingly and willfully falsifying or concealing a material fact or using any false document in submitting this petition.

**YOUR CERTIFICATION:** I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit that I am seeking.

## E. Signature of petitioner.

Date  6-17-04    Phone Number 713 455917 2

## F. Signature of person preparing this form, if other than the petitioner.

I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge.

Print Name  Avalyn C. Langemeier

Signature  Avalyn C. Langemeier    Date  6/18/04

Address  5177 Richmond Ave., Ste 800, Houston, TX 77056

G-28 ID or VOLAG Number, if any.    SBT24014328

Form I-130 (Rev. 06/05/02) Y Page 2

**U.S. Department of Justice**
Immigration and Naturalization Service

JUN 2 2 2004 OMB No. 1115-0053

**Form I-485, Application to Register Permanent Residence or Adjust Status**

## START HERE - Please Type or Print

### Part 1. Information about you.

| | | |
|---|---|---|
| Family Name FAYYAZ | Given Name Mohammad | Middle Initial |

Address - C/O

| Street Number and Name 794 Normandy 1416 | Apt. # |
|---|---|

City Houston

| State Texas | Zip Code 77015 |
|---|---|

| Date of Birth (month/day/year) 10/05/1977 | Country of Birth Pakistan |
|---|---|

| Social Security # | A # (if any) None 99 143 922 |
|---|---|

| Date of Last Arrival (month/day/year) 12/22/2002 | I-94 # 60713718107 |
|---|---|

| Current INS Status F1 | Expires on (month/day/year) D/S |
|---|---|

### Part 2. Application Type.    *(Check one)*

I am applying for adjustment to permanent resident status because

a. ☒ an immigrant petition giving me an immediately available immigrant visa number has been approved. (Attach a copy of the approval notice-- or a relative, special immigrant juvenile or special immigrant military visa petition filed with this application that will give you an immediately available visa number, if approved.)

b. ☐ My spouse or parent applied for adjustment of status or was granted lawful permanent residence in an immigrant visa category that allows derivative status for spouses and children.

c. ☐ I entered as a K-1 fiance(e) of a U.S. citizen whom I married within 90 days of entry, or I am the K-2 child of such a fiance(e) (Attach a copy of the fiance(e) petition approval notice and the marriage certificate.)

d. ☐ I was granted asylum or derivative asylum status as the spouse or child of a person granted asylum and am eligible for adjustment.

e. ☐ I am a native or citizen of Cuba admitted or paroled into the U.S. after January 1, 1959 and thereafter have been physically present in the U.S. for at least one year.

f. ☐ I am the husband, wife, or minor unmarried child of a Cuban described in (e) and residing with that person, and I was admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least one year.

g. ☐ I have continuously resided in the U.S. since before January 1, 1972.

h. ☐ Other basis of eligibility. Explain. (If additional space is needed, use a separate piece of paper.)

I am already a permanent resident and am applying to have the date I was granted permanent residence adjusted to the date I originally arrived in the U.S. as a nonimmigrant or parolee, or as of May 2, 1964, whichever date is later, and:    *(Check one)*

i. ☐ I am a native or citizen of Cuba and meet the description in (e), above.

j. ☐ I am the husband, wife or minor unmarried child of a Cuban, and meet the description in (f), above.

*Continued on back.*

Form I-485 (Rev. 02/07/00)N Page 1

### FOR INS USE ONLY

| Returned | Receipt |
|---|---|
| Resubmitted | MSC-04-273-21762 |
| Reloc Sent | 06-29-2004 |
| Reloc Rec'd | |

Applicant Interviewed    FEB 1 9 2005

Section of Law
☐ Sec. 209(b), INA
☐ Sec. 13 Act of 9/11/57
☐ Sec. 245, INA
☐ Sec. 249, INA
☐ Sec. 1 Act of 11/2/66
☐ Sec. 2 Act of 11/2/66
☐ Other

Country Chargeable

Eligibility Under Sec. 245
☐ Approved Visa Petition
☐ Dependent of Principal Alien
☐ Special Immigrant
☐ Other

Preference

Action Block

**To Be Completed by Attorney or Representative, if any**
☐ Fill in box if G-28 is attached to represent the applicant
VOLAG#
ATTY State License # SBT#24014328



Ex. A2

## Part 3. Processing Information

| A. City/Town/Village of Birth | Peshawar | | Current occupation | Network Engineer |
|---|---|---|---|---|
| Your mother's first name | Akbar | | Your father's first name | Mohammad |

Give your name exactly how it appears on your Arrival/Departure Record (Form I-94)

FAYYAZ Mohammad

| Place of last entry into the U.S. (City/State) Dallas, Texas | In what status did you last enter? *(Visitor, Student, exchange alien, crewman, temporary worker, without inspection etc.)* |
|---|---|
| Were you inspected by a U.S. Immigration Officer?   ☒ Yes  ☐ No | F1 |
| Nonimmigrant Visa Number         41259098 | Consulate where Visa was issued Ciudad Juarez |
| Date Visa was issued (month/day/year)   03/15/2001 | Sex.  ☒ Male  ☐ Female | Marital Status  ☒ Married  Single ☐ Divorced ☐ Widowed |

Have you ever before applied for permanent resident status in the U.S.?   ☒ No   ☐ Yes If you checked "Yes," give date and place of filing and final disposition

**B.** List your present husband/wife, all of your sons and daughters (if you have none, write "none". If additional space is needed, use separate paper).

| Family Name   FAYYAZ | Given Name   Gizela | Middle Initial   Rodriguez | Date of Birth (month/day/year)  08/07/1978 |
|---|---|---|---|
| Country of Birth          USA | Relationship        Wife | A #   N/A | Applying with you?  ☐ Yes  ☒ No |
| Family Name   GONZALES | Given Name   Lorenzo | Middle Initial   A. | Date of Birth (month/day/year)  06/14/1996 |
| Country of Birth          USA | Relationship        Step-son | A #   N/A | Applying with you?  ☐ Yes  ☒ No |
| Family Name   GONZALES | Given Name   Rosalinda | Middle Initial | Date of Birth (month/day/year)  06/30/1997 |
| Country of Birth          USA | Relationship        StepDaughter | A #   N/A | Applying with you?  ☐ Yes  ☒ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |

**C.** List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in other places since your 16th birthday. Include any foreign military service in this part. If none, write "none". Include the name(s) of organization(s), location(s), dates of membership from and to, and the nature of the organization(s). If additional space is needed, use a separate piece of paper.

None

## Part 3. Processing Information    *(Continued)*

Please answer the following questions. (If your answer is "Yes" on any one of these questions, explain on a separate piece of paper. Answering "Yes" does not necessarily mean that you are not entitled to register for permanent residence or adjust status)

1. Have you ever, in or outside the U.S.:
   a. knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested? ☐ Yes  ☒ No
   b. been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations? ☒ Yes  ☐ No
   c. been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action? ☐ Yes  ☒ No
   d. exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S.? ☐ Yes  ☒ No

2. Have you received public assistance in the U.S. from any source, including the U.S. government or any state, county, city, or municipality (other than emergency medical treatment), or are you likely to receive public assistance in the future? ☐ Yes  ☒ No

3. Have you ever:
   a. within the past 10 years been a prostitute or procured anyone for prostitution, or intend to engage in such activities in the future? ☐ Yes  ☒ No
   b. engaged in any unlawful commercialized vice, including, but not limited to, illegal gambling? ☐ Yes  ☒ No
   c. knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S. illegally? ☐ Yes  ☒ No
   d. illicitly trafficked in any controlled substance, or knowingly assisted, abetted or colluded in the illicit trafficking of any controlled substance? ☐ Yes  ☒ No

4. Have you ever engaged in, conspired to engage in, or do you intend to engage in, or have you ever solicited membership or funds for, or have you through any means ever assisted or provided any type of material support to, any person or organization that has ever engaged or conspired to engage, in sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity? ☐ Yes  ☒ No

5. Do you intend to engage in the U.S. in:
   a. espionage? ☐ Yes  ☒ No
   b. any activity a purpose of which is opposition to, or the control or overthrow of, the Government of the United States, by force, violence or other unlawful means? ☐ Yes  ☒ No
   c. any activity to violate or evade any law prohibiting the export from the United States of goods, technology or sensitive information? ☐ Yes  ☒ No

6. Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party? ☐ Yes  ☒ No

7. Did you, during the period March 23, 1933 to May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany, ever order, incite, assist or otherwise participate in the persecution of any person because of race, religion, national origin or political opinion? ☐ Yes  ☒ No

8. Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion? ☐ Yes  ☒ No

9. Have you ever been deported from the U.S., or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings? ☐ Yes  ☒ No

10. Are you under a final order of civil penalty for violating section 274C of the Immigration Act for use of fraudulent documents or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit? ☐ Yes  ☒ No

11. Have you ever left the U.S. to avoid being drafted into the U.S. Armed Forces? ☐ Yes  ☒ No

12. Have you ever been a J nonimmigrant exchange visitor who was subject to the two-year foreign residence requirement and not yet complied with that requirement or obtained a waiver? ☐ Yes  ☒ No

13. Are you now withholding custody of a U.S. Citizen child outside the U.S. from a person granted custody of the child? ☐ Yes  ☒ No

14. Do you plan to practice polygamy in the U.S.? ☐ Yes  ☒ No

*Continued on back*

Form I-485 (Rev. 02/07/00)N Page 3

**Part 4. Signature.** *(Read the information on penalties in the instructions before completing this section. You must file this application while in the United States.)*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it is all true and correct. I authorize the release of any information from my records which the INS needs to determine eligibility for the benefit I am seeking.

**Selective Service Registration.** The following applies to you if you are a man at least 18 years old, **but not yet 26 years old, who is required to register with the Selective Service System:** I understand that my filing this adjustment of status application with the Immigration and Naturalization Service authorizes the INS to provide certain registration information to the Selective Service System in accordance with the Military Selective Service Act. Upon INS acceptance of my application, I authorize INS to transmit to the Selective Service System my name, current address, Social Security number, date of birth and the date I filed the application for the purpose of recording my Selective Service registration as of the filing date. If, however, the INS does not accept my application, I further understand that, if so required, I am responsible for registering with the Selective Service by other means, provided I have not yet reached age 26.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| | | 06/17/04 | |

**Please Note:** *If you do not completely fill out this form, or fail to submit required documents listed in the instructions, you may not be found eligible for the requested document and this application may be denied.*

**Part 5.  Signature of person preparing form if other than above.**    *(Sign Below)*

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| | Avalyn C. Langemeier | 6/18/04 | 713-625-9200 |

| Firm Name and Address | QUAN, BURDETTE & PEREZ, P.C.  5177 Richmond Ave., Ste 800, Houston, TX 77056 |
|---|---|

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066
**BIOGRAPHIC INFORMATION**

| (Family name) | (First name) | (Middle name) | ☒ MALE | BIRTHDATE (Mo.-Day-Yr.) | NATIONALITY | FILE NUMBER |
|---|---|---|---|---|---|---|
| FAYYAZ | Mohammad | | ☐ FEMALE | 10/05/1977 | Pakistani | A- None |

| ALL OTHER NAMES USED (Including names by previous marriages) | | CITY AND COUNTRY OF BIRTH | | SOCIAL SECURITY NO. (If any) |
|---|---|---|---|---|
| FAYYAZ, Mohammad Khattak/Mohammad Khattah | | Peshawar    Pakistan | | |

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | | CITY AND COUNTRY OF RESIDENCE | |
|---|---|---|---|---|---|---|
| FATHER | KHATTAK | Mohammad | 06/20/1956 | Peshawar, Pakistan | Peshawar | Pakistan |
| MOTHER (Maiden name) | SULTANA | Akbar | 01/01/1957 | Peshawar, Pakistan | Peshawar | Pakistan |

| HUSBAND (If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | RODRIGUEZ | Gizela | 08/07/1978 | Brownsville    USA | 11/14/2003 | Houston, TX |

| FORMER HUSBANDS OR WIVES (If none, so state) | | | | | |
|---|---|---|---|---|---|
| FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE | |
| None | | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS. LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| 794 Normandy #1418 | Houston | Texas | USA | Dec. | 2003 | PRESENT TIME | |
| 16460 Highway #1603 | Webster | Texas | USA | Sept. | 2003 | Dec. | 2003 |
| 16460 Highway #703 | Webster | Texas | USA | Jan. | 1999 | Sept. | 2003 |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| Village Po Khawari, Nowshea District | Peshawar | | Pakistan | Oct. | 1977 | June | 1989 |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|
| Getronics | 9089 West Loop South, Houston, TX | Network Engineer | June | 2000 | PRESENT TIME | |
| Pizza Hut | 2622 Nasa Rd., Seabrook, Texas | Delivery Driver | Sept. | 1997 | Dec. | 1999 |

Show below last occupation abroad if not shown above. (Include all information requested above.)

None

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION  ☒ STATUS AS PERMANENT RESIDENT  ☐ OTHER (SPECIFY) | | 06/17/04 |

If your native alphabet is other than roman letters, write your name in your native alphabet here

**Submit all four pages of this form.**

PENALTIES. SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| FAYYAZ | Mohammad | | None |

(1) Ident.

Form G-325 A (Rev. 09-11-00)Y

*Press Office*
**U.S. Department of Homeland Security**



U.S. Citizenship
and Immigration
Services

# Fact Sheet

April 25, 2006

### Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Ex. A-3

Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check**— IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check**—FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks**—FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

Immigration Security Checks—How and Why the Process Works

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

Federal Bureau of Investigation - National Name Check Program-Frequently Asked Questions          Page 1 of 2



FEDERAL BUREAU OF INVESTIGATION

Home | Site Map | FAQs

SEARCH

**Contact Us**
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

**Learn About Us**
- Quick Facts
- What We Investigate
- Nat'l. Security Branch
- Information
  Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

**Get Our News**
- Press Room
- News Feeds

**Be Crime Smart**
- Wanted by the FBI
- More Protections

**Use Our Resources**
- For Law Enforcement
- For Communities
- For Researchers
- More Services

**Visit Our Kids' Page**

**Apply for a Job**

## National Name Check Program—Frequently Asked Questions

### How long will it take for my name check to be completed?

The length of time it takes for a name check to be completed varies from name to name. Normally, a name is submitted by an agency, such as the United States Citizenship and Immigration Services (USCIS), on a data tape. The National Name Check Program (NNCP) receives over 62,000 name checks every week, with over 27,000 coming from USCIS on a weekly basis. When a data tape comes in, the names on the tape are electronically checked against the Federal Bureau of Investigation's Universal Index (UNI). The searches seek all instances of the individual's name appearing in both main files and reference files. A main file name is that of an individual who is, himself/herself, the subject of an FBI investigation, whereas a reference is someone whose name appears in an FBI investigation. References may be associates, conspirators, or witnesses.

The majority of name checks submitted on a data tape are electronically checked and returned to the submitting agency as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's UNI database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth submitted within the last 120 days) are not checked, and the duplicate findings are returned immediately to the submitting agency.

A secondary manual name search conducted within 30-60 days usually identifies additional requests as having a "No Record." The remaining name checks (usually about 10% of the name checks originally submitted) are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record is available in the FBI's electronic record keeping system, it can be reviewed quickly. If not, the relevant information must be retrieved from an existing paper record. Review of this information determines whether the information is positively identified with the name check request. If the information is not identified with the request, the request is closed as a "No Record," and the requesting agency is notified as such.

The average time required to retrieve and review an FBI record for possible information related to a name check request is case specific---it depends on the number of files an analyst must obtain (which is dictated by the number of "hits" on a name), the location and availability of those files, and the amount of information contained in a file. If a file is stored locally, an analyst will be able to obtain the file within a matter of days. If a file is located in a field office or other FBI location, the applicable information must be requested from that location. There are over 265 different FBI locations that could house information pertinent to a name check request. If a file is electronically available, an analyst will have immediate access to that file. Additionally, once an analyst receives the file, or the pertinent information contained in a file, the analyst must review it for possible information related to the name check request.

Many times, the delay associated with the processing of the remaining name checks is not the actual time it takes to process a name check, but the time it takes for an analyst to get to the name check request in order to process it. This is due to the constant volume of name checks, several million each year, combined with the FBI's current work on processing residual name checks from a batch of 2.7 million requests submitted by USCIS in December 2002, as compared to the NNCP's limited resources. Less than one percent of the requests are identified with a file containing possible derogatory information. If applicable, the FBI then forwards a summary of the derogatory information to the requesting agency. It is important to note that the FBI **does not** adjudicate the name check requests, but only provides available information to a requesting agency for its adjudication process.

*Ex. A-4*

**How can I have my name check expedited?**

The FBI tries to process its oldest name checks first. Customer agencies will occasionally request expedited handling of specific name checks. Criteria used to determine which name checks receive expedited handling are internal matters of each customer agency. The FBI does request that the number of expedited cases be kept to a minimum in fairness to the other pending name check requests. Because each customer agency determines which name checks are expedited, contacting Congressional representatives, the FBI's Office of Congressional Affairs, or the NNCP will only further tie up vital resources and **will not** contribute to the expediting of a name check.

**Does contacting my Congressional representative expedite my name check?**

No, the customer agency determines expedited handling. The FBI's policy is to be responsive to our customer's needs given the limits of our resources. Re-prioritization from multiple sources would convolute the customer agency's ability to manage their priority cases.

**Is there a fee I can pay to expedite the process?**

No. Processing times are a function of the volume of work versus the resources that can be applied to the task. Paying an additional fee would not speed up the name check process.

**I am aware that some name checks have been completed that were submitted to the FBI *after* cases that remain pending. Why are the name checks not handled in the order in which they are received?**

The vast majority of name check requests are completed in less than 60 days. Of those remaining, the FBI tries to complete the oldest name checks first. The time to complete any given name check varies. There are many factors that impact processing times such as the number of files to retrieve and review, a file's location and accessibility, case status, and workload all impact processing times. Another factor that might delay the processing of a name check request on a first in/first out basis is the number of requests for expedited handling received from a customer agency.

**My Freedom of Information/Privacy Act request to the FBI resulted in a "no record" response. Given that, why is my name check request still pending?**

Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in an effort to protect our national security, in addition to searching a name in a multitude of combinations.

**Who can I call to check on the status of my name check?**

The FBI will only respond to status inquiries from its customer agencies. Please contact the organization receiving your original application. In Citizenship and Immigration cases, contact USCIS for the status.

Accessibility | eRulemaking | FirstGov | Freedom of Information Act | Links | Privacy Policy | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

ttp://www.fbi.gov/page2/nationalnamecheck.htm                                                    8/17/2006

Federal Bureau of Investigation - National Name Check Program                    Page 1 of 2



Home | Site Map | FAQs

## FEDERAL BUREAU OF INVESTIGATION

SEARCH

**Contact Us**
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

**Learn About Us**
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

**Get Our News**
- Press Room
- News Feeds

**Be Crime Smart**
- Wanted by the FBI
- More Protections

**Use Our Resources**
- For Law Enforcement
- For Communities
- For Researchers
- More Services

**Visit Our Kids' Page**

**Apply for a Job**

## National Name Check Program

**Mission:** The National Name Check Program's (NNCP's) mission is to disseminate information from FBI files in response to name check requests received from federal agencies including internal offices within the FBI; components within the legislative, judicial, and executive branches of the federal government; foreign police and intelligence agencies; and state and local law enforcement agencies within the criminal justice system.

**Purpose:** The NNCP has its genesis in Executive Order 10450, issued during the Eisenhower Administration. This executive order addresses personnel security issues, and mandated National Agency Checks (NACs) as part of the pre-employment vetting and background investigation process. The FBI is a primary NAC conducted on all U.S. government employees. Since September 11th, name check requests have grown, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege—whether that privilege is government employment or an appointment, a security clearance, attendance at a White House function, a Green card or naturalization, admission to the bar, or a visa for the privilege of visiting our homeland. More than 70 federal and state agencies regularly request FBI name checks. In addition to serving federal, state, and local government customers, the NNCP conducts numerous name searches in direct support of the counterintelligence, counterterrorism, and homeland security efforts of the FBI.

**Function:** The employees of the NNCP review and analyze potential identifiable documents to determine whether a specific individual has been the subject of or mentioned in any FBI investigation(s), and if so, what (if any) relevant information may be disseminated to the requesting agency. It is important to note that the FBI does not adjudicate the final outcome, it just reports the results to the requesting agency.

**More Information**
- Frequently Asked Questions
- Executive Order 10450

**Congressional Testimony:**
- David Hardy 10-23-03
- Robert Garrity 07-10-03

**Source of Data:** The NNCP conducts manual and electronic searches of the FBI's Central Records System (CRS) Universal Index (UNI). The CRS encompasses the centralized records of FBI Headquarters, field offices, and Legal Attache offices. The CRS contains all FBI investigative, administrative, personnel, and general files.

**NNCP Process Step-by-Step:**

- Agency/entity submission to the FBI's NNCP. Submissions are accepted via magnetic tape, hard copy, telephone, or fax.
- Electronic "batch" submissions are searched against the UNI. The majority of the batch names are electronically returned as "no record" with 48-72 hours. A "no record" indicates that the UNI database contains no identifiable information regarding a particular individual. The UNI is searched for "main files", files where the name of an individual is the subject of an FBI investigation, and for "reference files", files where the name being searched is just mentioned in an investigation.
- A secondary "manual" search of residuals from the batch run identifies an additional number of names as a "no record" response.
- The remaining paper files and/or electronic files are reviewed to ensure they are germane to the name check request.
- Identifiable files are then analyzed for relevant or derogatory information that may be disseminated to the requesting agency/entity. Approximately 1 percent of the requests are

determined to contain possible derogatory information. If applicable, the NNCP forwards a summary of the information to the submitting agency/entity.

**Growth of the Name Check Program:** Post September 11, 2001, the number of incoming name checks has increased to above pre-9/11 levels:

|  | FY 01 | FY 02 | FY 03 | FY 04 | FY 05 |
|---|---|---|---|---|---|
| Incoming Name Checks: | 2,771,241 | 3,288,018 | 6,309,346 | 3,884,467 | 3,346,435 |

**Freedom of Information and Privacy Act (FOIPA) vs. Name Check:** Freedom of Information and Privacy Acts (FOIPA) requests are sometimes confused with name check requests. FOIPA provides copies of FBI files relevant to a specific FOIPA request. For FOIPA, the FBI search uses the name or information as provided in the FOIPA request. A FOIPA search determines whether there is an investigative file associated with an individual—a "main file" search. For a name check, "main files" and "reference files" are both checked, in addition to searching a name in a multitude of combinations.

**Major Contributing Agencies:** The FBI's NNCP Section provides services to more than 70 federal, state, and local governments and entities. Although most name checks are conducted for each agency on a first-in, first-out basis, the contributing agency determines the order of resolution for priority, project, or expedite cases. The following are the major contributing agencies to the NNCP:

- U.S. Citizenship and Immigration Services – Submits name check requests on individuals applying for the following benefits: asylum, adjustment of status to legal permanent resident, naturalization, and waivers.
- Office of Personnel Management – Submits name checks requests in order to determine an individual's suitability and eligibility in seeking employment with the federal government.
- Department of State – Submits FBI name check requests on individuals applying for visas. Not all visa matters require FBI name checks.

Accessibility | eRulemaking | FirstGov | Freedom of Information Act | Links | Privacy Policy | White House

FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

U.S. Department of Homeland Security
Street Address
City, State Zip



**U.S. Citizenship
and Immigration
Services**

August 4, 2004

# Interoffice Memorandum

To:   REGIONAL DIRECTORS
      DISTRICT DIRECTORS
      SERVICE CENTER DIRECTORS
      NATIONAL BENEFITS CENTER DIRECTOR

From: William R. Yates
      Associate Director of Operations

Re:   Required Security Checks

This memorandum updates and explains existing policy regarding required security checks. Field Offices are reminded that prior to issuing documentation evidencing or resulting from a grant of lawful permanent resident (LPR) status or asylum, including an I-551 Alien Documentation Identification Technology Stamp (ADIT), an asylee-endorsed Arrival/Departure Record (I-94), or an Employment Authorization Document (EAD) based upon 8 CFR 274a.12(a)(5), all of the security checks listed below must be completed. These checks must be accomplished in all circumstances, whether the final grant of LPR status or asylum has been given by U.S. Citizenship and Immigration Service (USCIS) or the Executive Office for Immigration Review (EOIR) as a form of relief from removal. In those instances when USCIS is unsure whether the appropriate Security Checks have been conducted, the following checks must be completed by USCIS.

Interagency Border Inspection System (IBIS). IBIS is a multi-agency effort started by the Immigration and Naturalization Service, Department of Agriculture, US Customs Service, and the Department of State. Twenty-four individual agencies have contributed information to this lookout system. An IBIS query also includes a check of the National Crime Information Center (NCIC), managed by the Federal Bureau of Investigation (FBI) for federal, state, and local law enforcement entities to share data concerning wanted persons, criminals, persons of interest, and routine legal administrative matters.

Ten-print fingerprint. This check is completed through the taking of fingerprints at the local Application Support Center (ASC). The Criminal Justice Information Services (CJIS) Division of the FBI conducts Fingerprint Background Checks through the submission of fingerprints and a search of the FBI's Criminal History Master File. The Fingerprint Background Check will include only information that has been submitted to the FBI by local, state, federal, or international criminal justice agencies. In addition to the fingerprint search, a name search only is conducted against the NCIC Gang and Terrorist Organization File.

FBI Name Check. This check is conducted against two separate databases. A <u>Main Index</u> search matches the applicant's name against the name of people who are, or have been, the subject of an investigation; a

*Ex. A-5*

Required Security Checks
Page 2

<u>Reference</u> search matches the applicant's name against names that appear in investigative reports, even though s/he may not be the subject of the investigation.

Following the attacks of September 11, 2001, law enforcement and intelligence agencies have increased information sharing. An IBIS check performed today provides information from numerous enforcement and intelligence agencies. As a result of these efforts, it is no longer necessary for USCIS to conduct a separate Central Intelligence Agency (CIA) Check. Effective immediately field offices may discontinue the practice of waiting 60 days for a response from the CIA.

If you have any questions regarding this memorandum, please contact Patricia Nolin, Field Operations, at 202/514-2982.



Ex. B

10-25-1886



The State of Texas
County of Harris

To any regularly licensed or ordained Christian minister or priest; Jewish rabbi; person who is an officer of a religious organization and who is authorized by the organization to conduct a marriage ceremony; justice of the supreme court, judge of the court of criminal appeals, justice of the courts of appeals, judge of the district, county, and probate courts, judge of the county courts at law, judge of the courts of domestic relations, judge of the juvenile courts, retired justice or judge of those courts, justice of the peace, retired justice of the peace, or judge or magistrate of a federal court of this state.

Greeting:

You are hereby authorized to conduct the Rites of Matrimony between

MOHAMMAD FAYYAZ and GIZELA RODRIGUEZ

and make due return to the County Clerk of Harris County, Texas, within thirty (30) days of performing the marriage, certifying your action under this license. Witness my official signature and seal of office in Harris County, Texas at 01:43 P.M., November 11, 2003.

Beverly B. Kaufman
County Clerk, Harris County, Texas

Lou Walcik                                    Deputy

Mr. and Mrs. Mohammad Fayyaz
16460 Hwy 3
Apartment 703
Webster, TX        77598

Ex. C

$\cdot.0-25-1887$

*Officer's Return*

*This certifies that I have united in marriage the parties named on the front of this license on*

November 14, 2003
*(Date)*

_____
*Signature*

Judge Louie Ditta
*Printed or Typed Name*

Justice of the Peace, Pct. 8-2
*Title*

Houston, Harris County, Texas
*County in which ceremony was performed*

```
                                    W      3751
              11/11/03  1700004971        $36.00
              Marriage License
```

FILED
2003 NOV 18 PM 3:01
COUNTY CLERK
HARRIS CO., TEXAS

Section 2.201 Family Code. If a marriage ceremony has not been conducted before the 31st day after the date the license is issued, the marriage license expires.

This license is not valid for seventy-two (72) hours from the time of issuance.

Accompanied by TDH Material as required by Section 2.009 ( e ) (4) Family Code.

Form No. CC-B-03-31-02 (Rev. 09/10/97)

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066
**BIOGRAPHIC INFORMATION**

| (Family name) | (First name) | (Middle name) | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) | NATIONALITY | FILE NUMBER |
|---|---|---|---|---|---|---|
| FAYYAZ | Mohammad | | | 10/05/1977 | Pakistanian | ⌐ None |

| ALL OTHER NAMES USED (Including names by previous marriages) | CITY AND COUNTRY OF BIRTH | SOCIAL SECURITY NO (If any) |
|---|---|---|
| FAYYAZ, Mohammad Khattak/Mohammad Khattah | Peshawar    Pakistan | 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 |

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | KHATTAK | Mohammad | 06/20/1956  Peshawar, Pakistan | Peshawar    Pakistan |
| MOTHER (Maiden name) | SULTANA | Akbar | 01/01/1957  Peshawar, Pakistan | Peshawar    Pakistan |

| HUSBAND (If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | RODRIGUEZ | Gizela | 08/07/1978 | Brownsville USA | 11/14/2003 | Houston, TX |

| FORMER HUSBANDS OR WIVES (If none, so state) FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| None | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS. LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| 794 Normandy #1418 | Houston | Texas | USA | Dec. | 2003 | PRESENT TIME | |
| 16460 Highway #1603 | Webster | Texas | USA | Sept. | 2003 | Dec. | 2003 |
| 16460 Highway #703 | Webster | Texas | USA | Jan. | 1999 | Sept. | 2003 |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| Village Po Khawari, Nowshea District | Peshawar | | Pakistan | Oct. | 1977 | June | 1989 |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|
| Getronics | 9089 West Loop South, Houston, TX | Network Engineer | June | 2000 | PRESENT TIME | |
| Pizza Hut | 2622 Nasa Rd., Seabrook, Texas | Delivery Driver | Sept. | 1997 | Dec. | 1999 |
| | | | | | | |

Show below last occupation abroad if not shown above. (Include all information requested above.)

| None | | | | | | |
|---|---|---|---|---|---|---|

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION  ☒ STATUS AS PERMANENT RESIDENT  ☐ OTHER (SPECIFY): | | 06/17/04 |
| **Submit all four pages of this form.** | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| FAYYAZ | Mohammad | None | |

Ex. D

(1) Ident.

Form G-325 A (Rev. 09/11/00)Y