IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD FAYYAZ and | § | |
| GIZELA FAYYAZ, | § | |
| | § | |
| *Plaintiffs* | § | Civil Action No. 06-2016 (HHK) |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, THROUGH ITS | § | |
| SECRETARY, MICHAEL CHERTOFF, | § | |
| EMILIO GONZALEZ, DIRECTOR, | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| SHARON HUDSON, DISTRICT | § | |
| DIRECTOR, HOUSTON, USCIS, AND | § | |
| ROBERT MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION, | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFFS' RESPONSE OPPOSING DEFENDANTS' MOTION TO TRANSFER OR, IN THE ALTERNATIVE, TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Mohammad Fayyaz and Gizela Fayyaz ("Fayyaz") and files this response opposing Defendants' Motion to Transfer, or in the alternative, to Dismiss. Plaintiffs pray that the Court deny Defendants' Motion. In support of their response to Defendants' Motion, Plaintiffs refer the Court to the accompanying memorandum of points and authorities. A proposed Order is attached.

Respectfully submitted,


/s/ Jonathan S. Rochkind

Jonathan S. Rochkind
Smith, Hudson & Carluzzo, P.C.
9300 West Courthouse Road
Judiciary Square – Suite 203
Manassas, Virginia 20110
(703) 361-0776 ext 107
DC Bar ID number 425185


COANE & ASSOCIATES


/s/ James P. McCollom, Jr.
Bruce A. Coane
SBOT No. 04423600
Ajay Choudhary
SBOT No. 90001623
James P. McCollom, Jr.
SBOT No. 13431960
3D/International Tower
1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by electronic means through the Electronic Case Filing system on April 18, 2007 to:


Ms. Karen L. Melnik
Assistant U.S. Attorney
Judiciary Center Building
555 4th Street, NW Rm. E-4112
Civil Division
Washington, DC 20530
Karen.melnik@usdoj.gov


/s/ James P. McCollom, Jr.
James P. McCollom, Jr.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD FAYYAZ and | § | |
| GIZELA FAYYAZ, | § | |
| | § | |
| *Plaintiffs* | § | Civil Action No. 06-2016 (HHK) |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, THROUGH ITS | § | |
| SECRETARY, MICHAEL CHERTOFF, | § | |
| EMILIO GONZALEZ, DIRECTOR, | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| SHARON HUDSON, DISTRICT | § | |
| DIRECTOR, HOUSTON, USCIS, AND | § | |
| ROBERT MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION, | § | |
| | § | |
| *Defendants* | § | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE OPPOSING DEFENDANTS' MOTION TO TRANSFER OR, IN THE ALTERNATIVE, TO DISMISS

Plaintiffs Mohammad and Gizela Fayyaz ("Fayyaz") respectfully request that the Court deny Defendants' Motion to Transfer or, in the alternative, to Dismiss, and would show as follows:

## I.  Introduction

Fayyaz brings this lawsuit seeking to compel action on an application for lawful permanent resident status that he filed with the Defendants on June 29, 2004.

The Defendants have moved pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure to dismiss this action for lack of subject matter jurisdiction. The Defendants' motions are the only issue before the Court.

Federal Rule of Civil Procedure 12(b)(1) requires that the plaintiff bear the burden of establishing that the court has subject matter jurisdiction. *Brady Campaign to Prevent Gun Violence v. Ashcroft,* 339 F.Supp.2d 68, 72 (D.D.C.2004). While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), because the plaintiff has the burden of proof to establish jurisdiction, the " 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13-14 (D.D.C.2001).

The standard of review on a 12(b)(6) motion is that a claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

On a 12(b)(6) motion, the Court assumes the truth of the material facts as alleged in the complaint, *see Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) and the "complaint should not be dismissed unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). The complaint "is construed liberally in the plaintiffs'

favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived

from the facts alleged." *Kowal v. MCI Communications Corp.,* 16 F.3d at 1276.

## II.  Venue Is Appropriate in Washington, D.C.

The Defendants move the Court to transfer this case to the Southern District of Texas

pursuant to 28 U.S.C.§1404(a).  D Motion, 9.  Yet, venue properly lies in Washington, D.C.

according to 28 U.S.C.§1391(e) as the Defendants Department of Homeland Security, United

States Citizenship and Immigration Services, and the Federal Bureau of Investigation all reside

in Washington, D.C.  28 U.S.C.§1391(e) states:

> A civil action in which a defendant is an officer or employee of the United States
> or any agency thereof acting in his official capacity or under color of legal
> authority, or an agency of the United States, or the United States, may, except as
> otherwise provided by law, be brought in any judicial district in which (1) a
> defendant in the action resides …

Furthermore, as authority for their argument, the Defendants cite a case in which a prisoner filed

a *Bivens* action against defendants in their individual capacities for damages and an injunctive

action against officials in their official capacities.  (D Motion, 8).  *Cameron v. Thornburgh,* 983

F.2d 253, 255 (D.C.Cir.1993).  1391(e) does not apply to *Bivens* actions.  *Cameron v.

Thornburgh,* 983 F.2d at 256 *citing Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1

(1980).  However, 1391(e) certainly applies to an action for an injunction against defendants in

their official capacities and venue properly lies in any district in which one defendant resides.

*Cameron v. Thornburgh,* 983 F.2d at 257, n.2.  In *Cameron,* venue became improper in the

District of Columbia only when the injunctive claim became moot.  *Id.*

1391(e) permits an action which is essentially against the United States to be brought

locally rather than requiring that it be brought in the District of Columbia.  *Stafford v. Briggs,*

444 U.S. at 542.  Prior to the Mandamus and Venue Act of 1962, plaintiffs seeking mandamus

relief in a suit essentially against the federal government were required to file in the District of

Columbia.  *Stafford v. Briggs,* 444 U.S. at 534.  Yet 1391(e) is a permissive statute and thus the

Plaintiffs may properly file a mandamus-type suit that is essentially against the United States

government in the District of Columbia.  1391(e) is a statute which broadens venue but venue in

the District of Columbia is still permitted.  *Stafford v. Briggs,* 444 U.S. at 543 *citing Schlanger v.*

*Seamans,* 401 U.S. 487, 490, n. 4, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971).

The Defendants also inappositely cite another prisoner case for damages.  (D Motion, 8).

*Joyner v. District of Columbia,* 267 F.Supp.2d 15 (D.C.Cir.2003).  Neither *Cameron* nor *Joyner*

is a mandamus-type lawsuit filed essentially against the United States government as is the

instant case.  Neither the *Cameron* nor *Joyner* plaintiffs can avail themselves of the venue statute

1391(e).  Both *Cameron* and *Joyner* alleged ill treatment in places far away from Washington,

D.C. and named federal government officials as defendants.  Both of these cases involved

disputed facts requiring witnesses in their locales.  In both of these cases, the Courts dismissed

the federal government defendants or ruled that there was at best a tenuous connection between

the prisoner and Washington, D.C.  As a result, the Courts transferred venue.

The Defendants further inaccurately compare the instant case on its facts to *Cameron* and

*Joyner.*  (D motion, 7-8).  First, a prisoner suit is a suit for damages that does not fall under the

general venue statute as does a mandamus-type lawsuit under federal immigration laws.  The

defendants in the instant suit are properly named defendants because they are the federal

government officials who are the decision-makers in immigration matters.  *See 8 C.F.R. § 2.1.*

In addition, the Plaintiffs have sued the FBI, the Defendant that is conducting the name check

that is pending as of the time of this lawsuit.  (D Motion, Ex. A¶7(h)).  It is the federal

government officials in Washington, D.C. who are directing the policy that has ultimately resulted in no decision having been made on this case.  For example, the USCIS Defendant Headquarters in Washington, D.C. has recently issued a memorandum stating that USCIS policy will be to no longer routinely request that an FBI name check be expedited when a mandamus lawsuit is filed.  (Exhibit A).  As will be argued more extensively later, although the Houston District Director Defendant may ultimately make a decision on the adjustment of status application itself, the policy makers in Washington, D.C., in both the Department of Homeland Security and the FBI, have failed to respond to the increased demand for name checks.  (D Motion, Ex. A-3 and A-4).  As will be seen later, this problem has not been redressed for at least ten years.  It is inaccurate to say that there is little or no connection to Washington, D.C. regarding the adjudication of this case.

It should also be noted that there are no contested facts on the application for adjustment of status to be decided in this lawsuit.  Rather, Plaintiffs simply want the agency to make a decision on his application.  It is apparent that before adjudicating this petition, the Defendants are simply awaiting the results of the FBI name check.

### III.  This Court Should Not Transfer Venue

The Defendants move to transfer this case to the U.S. District Court for the Southern District of Texas under 28 U.S.C. § 1404(a) but fail to carry their burden.  The statute states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  *Id.*

"In order to succeed on their motion, defendants have the heavy burden of establishing the plaintiff's choice of forum is inappropriate."  *Shapiro, Lifschitz, & Schram, P.C. v. Hazard,* 24 F.Supp.2d 66, 71 (D.D.C.1998) *citing Pain v. United Technologies Corp.,* 637 F.2d 775, 783

(D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).  However, less weight is given to a foreign plaintiff's choice of forum.  *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255-56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

The Court has broad discretion to adjudicate motions to transfer under 1404(a).  *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955).  However, the Court may not transfer a case "from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff."  *Shapiro, Lifschitz, & Schram, P.C.,* 24 F.Supp.2d 66, 71 *citing Pain v. United Technologies, Corp.,* 637 F.2d 775, 783.

A threshold question under 1404(a) is whether the case could have been brought in the district to which transfer is sought.  *Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).  There is no issue that the case could have been brought in the Southern District of Texas.

A motion to transfer under 1404(a) requires a factually intensive analysis to determine which forum is more appropriate.  *Thayer/Patricof Educ. Funding LLC v. Pryor Res.,* 196 F.Supp.2d 21, 32 (D.D.C.2002).

"Courts consider several factors in determining whether a case should be transferred under section 1404(a), including private and public interests.  The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses …, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.  The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential

transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Id.* at 31-32.

It is true that the interests of justice militate a transfer when it is a local dispute. For example, if the outcome would affect the land, water, and wildlife of Colorado, then the Court properly transferred the case to Colorado from Washington, D.C. *Thayer/Patricof Educ. Funding LLC v. Pryor Res.,* 196 F.Supp.2d at 37, n. 10 (D.D.C.2002) *citing Trout Unlimited v. Dep't of Agric.,* 944 F.Supp. 13, 19 (D.D.C. 1996). Likewise, the Court transferred a case from to Kansas from Washington, D.C. primarily because of the "local interest" relating to the "development of a massive area in Kansas." *Shawnee Tribe v. United States,* 298 F.Supp.2d 21, (D.D.C.2002). Similarly, the Court transferred a case to California from Washington, D.C. because "at core" the dispute involved the proposed construction of a hotel/casino on a certain parcel of land in San Diego County. *Rosales v. U.S.,* --- F.Supp.2d ---, 2007 WL 809663 (D.D.C. Mar. 19, 2007). Again, the Court transferred a case to Florida from Washington, D.C. largely because there was a strong local interest in deciding a dispute regarding issuing mining permits for certain Everglades wetlands in southern Florida. *Sierra Club v. Flowers,* 276 F.Supp. 62, 70-71 (D.D.C.2003).

In their argument on venue, the Defendants make a fundamental error. Plaintiffs complain of agency delay in making the decision on the adjustment of status case. In all of the cases on venue cited by the Defendants, the issue is the actual determination of a factual controversy. Such a determination requires witnesses and a finder of fact. In all but one of the cases cited by the Defendants such a determination further involved local issues. In the instant lawsuit, there are no facts for the Court to determine on the application for the adjustment of status. Rather, Plaintiffs seek to have the Court compel the Defendants to issue a decision. As

such, the actual result of the decision on the adjustment of status application is not relevant to this action.

The gravamen of Plaintiffs' complaint is that the Defendants have failed to act to clear a backlog of FBI name checks that has existed for over 10 years. *Sze v. INS,* 1997 WL 446236 (N.D.Cal. Jul 24, 1997). As such, the federal government Defendants have caused an unreasonable delay for the respective local USCIS offices in processing otherwise simple adjustment of status applications. In order to further develop this issue, it is necessary to preview an essential part of Plaintiffs' argument as to jurisdiction.

The leading case on the issue of whether relief under the APA is warranted for "agency action unlawfully withheld or unreasonably delayed" is *Telecomm. Research and Action Ctr. (TRAC) v. FCC,* 750 F.2d 70 (D.C.Cir.1984). The *TRAC* case sets forth six relevant factors. For example, the first factor is that the Court must consider the agency's justification for the pace of its decision. *Muwekma Tribe v. Babbitt,* 133 F.Supp.2d 30, 36 (D.D.C.2000). An examination of the TRAC factors necessarily involves an examination of the action of the agency as a whole. The Defendants argue that the Court should transfer venue because the federal government officials in Washington, D.C. are not involved in the decision-making process. (D Memo, 6). While it is true that the federal government official is not ordinarily involved in the adjudication of a particular adjustment of status application, this Court is not deciding the merits of the adjustment of status application itself. Rather, this Court is reviewing whether the agencies have unreasonably delayed the processing of the application. The conduct of the federal officials and the agencies in Washington, D.C. is certainly at issue.

In considering the TRAC analysis, Courts have frequently considered the fourth factor significant: the effect of expediting delayed action on agency activities of a higher or competing

priority. *See eg. Sze v. INS,* 1997 WL at *8. In 1997, the *Sze* Court held that agency delay was reasonable, in large part, because the delay in the processing of FBI name checks was largely attributable to "short-term factors such as increased applicants, recent changes to INS' processing rules, and the fallout from the FBI's recent relocation of its facilities" and because the Plaintiffs had shown no bad faith on the part of the INS or the FBI. *Id.* The *Sze* Court reasoned that in view of the limited resources of the agency, the agency was in the best position to allocate its resources and a court order would at best reorder the queue, leading to little benefit. *Id.*

Fayyaz brings suit alleging agency delay because in the ten years since the *Sze* decision, for example, the federal agencies have not corrected the "short-term factors" that account for the delay in the processing of FBI name checks and there is no end in sight. The Defendants, in their Motion to Dismiss, have not offered any timetable as to when the FBI name check might be cleared nor have they made any assurances that they are diligently processing the application. Defendants also admit that the problem of the delay in processing name checks is largely one of methodology. (D Motion, Ex. A-3 and A-4). The Defendants state that the files might be located locally or in a field office or in another FBI location. (D Motion, Ex. A-3 and A-4). The Defendants state that the delay is frequently caused by the time it takes an analyst to get to the name check request in order to process it. (D Motion, Ex. A-3). The Defendants offer obstacles and no solutions. In other contexts, when the agency has refused to act over a protracted period of time, as will be demonstrated in further detail in this response, the Court has ordered the agency to take action, or has maintained jurisdiction over the case, to monitor the agency.

The Department of Labor was plagued by extensive delays in the processing of alien labor certifications for many years. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d 105, 109

(D.D.C.2005). In 1999 and 2000, the Department of Labor took several steps to assist its regional offices in processing permanent labor certification cases. *Id.* at 110. In July 2004, the Department of Labor created two "backlog" centers dedicated to processing and eliminating the backlog of applications for permanent labor certifications. *Id.* In December 2004, the Department amended agency regulations resulting in great improvements in the way cases were processed. *Id.* at 111.

The *Liberty Fund* Court, when faced with a claim of unreasonable delay in the processing of certain alien labor certifications, again found most significant the fourth *TRAC* factor. *Id.* at 116. The Court placed great weight on a projected timeline that the Department had provided to process the cases. *Id.* at 116. As in *Sze,* the *Liberty Fund* Court declined to reorder agency priorities in the face of the good faith of the Department and the reasonableness of its actions. *Id.* at 120.

In other contexts, an "ambiguous, indefinite timeframe for review of the plaintiff's petition" has been held to be unreasonable agency delay under APA§706(1). *Muwekma Tribe v. Babbitt,* 133 F.Supp.2d 30, 37 (D.D.C.2000). The *Muwekma* Court also cited the "specific history of interaction" between the parties. *Id.*

In other instances, Courts have not found "unreasonable delay" but have retained jurisdiction over a case to monitor agency assurances that it is proceeding as diligently as possible with the resources available to it. *See eg. St. Lawrence Seaway Pilots' Ass'n v. Collins,* 362 F.Supp.2d 59, 75 (D.D.C.2005).

Even though the Defendants claim that there is an inadequate nexus to the events in the case with Washington, D.C., this argument cannot stand. In another lawsuit on the same issue, the federal government Defendants proffered as an exhibit the Declaration of Michael A.

Cannon, the Section Chief, National Name Check Program Section, Records Management

Division, Federal Bureau of Investigation, Washington, D.C. (Exhibit B). In Paragraph 9 of his

declaration, Mr. Cannon describes that the FBI implemented the Automated Case Support

system in 1995. Mr. Cannon does not describe any further attempts by the FBI to respond to the

increased volume of name checks. In Paragraph 20, Mr. Cannon recites a laundry list of possible

reasons affecting the time frame for processing name checks. The Defendants state that "the

delay in the processing of Plaintiff's applications is a matter related to the Houston CIS office."

(D Motion, 10). In Paragraph 22, Mr. Cannon states that the name check has not been

completed. He further states that the "FBI is performing its check in response to USCIS's

request in accordance with the procedures outlined above. The results of the name check will be

forwarded to USCIS in Washington, D.C. in due course, in accordance with the FBI's normal

protocol." Therefore, it is a fair conclusion to draw that it is actually the FBI that is the cause of

the delay because it is the agency processing the name check. Further, it should be noted that

Mr. Cannon stated that he will forward the name check result to USCIS in Washington, D.C.

In Paragraph 20, Mr. Cannon also states that "the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results." The Defendants frame the issue as one of national security. The real question is

whether in the face of a question of national security, the delay by the Defendants is reasonable.

The Defendants do not appear to have taken any action to alleviate the delay in processing these

applications since 1995. These policy decisions are made in Washington, D.C. and,

correspondingly, Defendants' argument that there is an inadequate nexus to Washington, D.C. is

incorrect.

It should be further noted that 8 U.S.C. § 1571 states that "it is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1572 and 1573 require the Attorney General to reduce the backlog in the processing of immigration applications.

Venue is proper in Washington, D.C. because the delay in processing the adjustment of status application of Fayyaz is not being immediately created by the local USCIS office in Houston, Texas. Rather, the delay is being created in particular by the FBI Defendant in Washington, D.C.. As such, there is a sufficient nexus to Washington, D.C.

IV. This Court has subject matter jurisdiction

Federal question jurisdiction, 28 U.S.C. § 1331 and § 706(1) of the Administrative Procedures Act combine to provide subject matter jurisdiction over challenges to unreasonably delayed agency action unless there is a statute which restricts judicial review. *Yu v. Brown,* 36 F.Supp.2d 922, 929 (D.N.M.1999) *citing Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *See also Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094, 1098 (D.C.Cir.2003).

A. 8 U.S.C. § 1252(a)(2)(B)(ii) does not divest this Court of jurisdiction

The Defendants assert incorrectly that 8 U.S.C. § 1252(a)(2)(B)(ii) strips the Court of jurisdiction. (D Motion, 9). Under this statute, Courts are barred from reviewing any "decision or action of the Attorney General … the authority for which is specified under this title to be in the discretion of the Attorney General." Discretionary decisions regarding the adjudication of an application for adjustment of status under 8 U.S.C. § 1255 may not be reviewed under this statute. *Wilkinson-Okotie v. U.S. Dept. of Homeland Security,* 2006 WL 2792405 (S.D.Tex.Sept.26, 2006). The Defendants appear to be confusing the discretion in the ultimate decision whether to

grant lawful permanent resident status and the question whether it has discretion to refuse to act on Plaintiff's application. *Yu v. Brown,* 36 F.Supp.2d at 931. It has been specifically held that 8 U.S.C.§1252(a)(2)(B)(ii) does not strip jurisdiction over a claim of agency delay in processing an adjustment of status application. *Duan v. Zamberry,* 2007 WL 626116 (W.D.Pa. Feb.23, 2007) *criticizing Safadi v. Howard,* 466 F.Supp.2d 696 (E.D.Va.2006); *Elmalky v. Upchurch,* 2007 WL 944330 (N.D.Tex. Mar.28, 2007) *criticizing Safadi v. Howard.* The *Safadi* court held that 8 U.S.C.§1252(a)(2)(B)(ii) does strip jurisdiction over the pace at which the USCIS processed an application for adjustment of status.

The Defendants further state that "pertinent regulations support the USCIS's discretionary decision to withhold adjudication." (D Motion, 10 citing 8 C.F.R.§103.2(b)(7)). The problem is that in this case the Defendants have not claimed that they are acting under this regulation. Further, it should be noted that the Defendants are stating that it is a **regulation** that provides discretion for the USCIS to withhold adjudication. Assuming arguendo that the regulation provides discretion, under 8 U.S.C.§1252(a)(2)(B)(ii) jurisdiction is only stripped when a **statute** specifies that the action lies within the discretion of the Attorney General. *Zhao v. Gonzales,* 404 F.3d 295, 303 (5th Cir. 2005). If a regulation specifies the quantum of discretion, then jurisdiction is not stripped under 8 U.S.C.§1252(a)(2)(B)(ii).

B. 8 U.S.C.§1252(g) does not divest this Court of jurisdiction

The Defendants incorrectly assert that 8 U.S.C.§1252(g) divests this Court of jurisdiction. Counsel misapprehends the scope of 1252(g). The Fifth Circuit has stated that the Supreme Court in *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) narrowly construed the reach of 1252(g). *Cardoso v. Reno,* 216 F.3d 512, 516 (5th Cir. 2000). The Congressional aim of §1252(g) is to protect from judicial intervention

the Attorney General's long-established discretion to decide whether and when to prosecute or adjudicate **removal proceedings** or to execute removal orders. *Alvidres-Reyes v. Reno,* 180 F.3d 199 (5th Cir. 1999). (emphasis added). The Supreme Court stated that 1252(g) was directed at the particular evil of imposing judicial constraints on prosecutorial discretion. *Reno v. Am.-Arab Anti Discrimination Comm.* at 944, fn.9. The Supreme Court stated that at each stage (commencing proceedings, adjudicating cases, and executing removal orders) the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience. *Reno v. Am.-Arab Anti Discrimination Comm.* at 943. 1252(g) does not apply to a claim of unreasonable agency delay in processing an adjustment of status application. *See eg. Elmalky v. Upchurch,* 2007 WL 944330 (N.D.Tex. Mar.28, 2007)

C. The Defendants have not processed the Plaintiff's adjustment
of status application within a reasonable time

The Administrative Procedures Act provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and **within a reasonable time**, each agency shall proceed to conclude a matter presented to it …." 5 U.S.C.§555(b) (emphasis added).

The Administrative Procedures Act further provides that the federal courts "shall … compel agency action unlawfully withheld or unreasonably delayed …." 5 U.S.C.§706(1).

There is no statute stripping this Court of jurisdiction to review a claim of unreasonable agency delay by the USCIS in processing immigration applications. The question thus becomes whether the USCIS is in violation of 5 U.S.C.§555(b). *Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d at 1100.

D. Defendants have unreasonably delayed adjudication of Plaintiffs' applications

In the leading case on the issue of unreasonable delay, *Telecommunications Res. and Action Ctr. V. FCC,* 750 F.2d 70 (D.C.Cir.1984) ("TRAC"), the Court identified six relevant considerations.

First, the TRAC Court said that a "rule of reason" governs the time agencies take to make decisions. *Id.* At 80.

On the one hand, the rule of reason cautions against ordering action in this case because there are pending FBI security name checks. It has become evident that "[d]elays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world." *Alkenani v. Barrows,* 356 F.Supp.2d 652, 657 (N.D.Tex2005).

On the other hand, the USCIS has an affirmative duty to adjudicate the application for adjustment of status. 8 C.F.R.§245.2. Therefore, when the USCIS fails to do so after almost three years, the applicant may rightfully seek Court intervention. Under the rule of reason, the USCIS cannot delay indefinitely. The question then becomes at what point should the Court act.

Second, the TRAC court said that a statutory scheme may supply content for the rule of reason. *Id.* at 80. It should be further noted that 8 U.S.C.§1571 states that "it is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." 8 U.S.C.§1572 and 1573 require the Attorney General to reduce the backlog in the processing of immigration applications. Further, there are published guidelines by the USCIS Houston District office that show that this case is well outside of processing guidelines. (Exhibit C).

Third, the TRAC court said that reasonable delays in the sphere of economic regulation are less tolerable when human health and welfare are at stake. *Id.* at 80. This consideration does not at first blush apply in this case because economic regulations are not at stake. At the same

time, the concern is that by refusing to act, and by further arguing that there should be no review of that refusal, the Defendants "relegate aliens to a state of 'limbo,' leaving them to languish indefinitely." *Kim v. Ashcroft,* 340 F.Supp.2d 384, 393 (S.D.N.Y.2004).

Fourth, the TRAC court said that the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority. *Id.* at 80. Plaintiffs complain that the named Defendant, the Federal Bureau of Investigation, has not completed the requisite name checks.

In two recent cases, when faced with a claim of unreasonable delay, the Court has refused to order an agency to adjudicate a petition in large part because of this fourth consideration. *Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094 (D.C.Cir.2003); *Liberty Fund, Inc. v. Chao,* 394 F.Supp2d 105 (D.D.C.2005). The Court reasoned that because the Department of Labor adhered to a principle of "first-in, first-out" in processing its applications, moving the petitioner to the front of the line would be at the expense of similarly situated applicants. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 115. The Court said that the Department's decision on how to handle competing applications is deserving of deference. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 117. The Court also said that although the Department of Labor was initially slow to react to a substantial increase in applications, it has, in more recent years taken comprehensive steps to process the applications more quickly. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120. The Court placed great weight on the representations by the Department of Labor that projected guidelines showed that there would be relief in the foreseeable future as applications would be completed. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 116. The Court further believed that the Department of Labor's efforts demonstrated their good faith. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120.

In contrast, in the instant case, the Defendants are offering no timetable to resolve this impossible situation.  The Defendants state that name check requests have grown since 9-11. (Exhibit A-4).  Yet, unlike the Department of Labor, as detailed above, the Defendant FBI has apparently instituted no comprehensive steps to solve the situation.  Rather, the Defendant FBI is relying on antiquated methods of manually checking files that are located at offices throughout the country.  (Exhibit A-3 and A-4).

In 1997, the *Sze* Court held that agency delay was reasonable, in large part, because the delay in the processing of FBI name checks was largely attributable to "short-term factors such as increased applicants, recent changes to INS' processing rules, and the fallout from the FBI's recent relocation of its facilities" and because the Plaintiffs had shown no bad faith on the part of the INS or the FBI.  *Sze v. INS,* 1997 WL 446236 (N.D.Cal. Jul 24, 1997).  The *Sze* Court reasoned that in view of the limited resources of the agency, the agency was in the best position to allocate its resources and a court order would at best reorder the queue, leading to little benefit.  *Id.*

Ten years later, in the instant case, good faith cannot be presumed because the Defendant FBI has not demonstrated that it has taken any action to respond to the development of a vast increase of name check applications to process over the last ten years.  Consequently, immigrants all over the country similarly situated to Plaintiffs are in limbo.  Fayyaz has been forced to resort to filing a lawsuit only because of this impossible situation.

It is undisputed that Fayyaz is one of many intending immigrants who are filing lawsuits of this sort because they are in limbo for years waiting for a logjam to clear.  Fayyaz does not seek preferential treatment.  Rather, he seeks that the FBI Defendant take appropriate steps to

address the backlog so that his case in turn might be resolved.  Fayyaz complains about a systemic failure at the agency level to address its backlog.

8 U.S.C. § 1573 mandates that the Attorney General "shall take such measures as may be necessary to … reduce the backlog in the processing of immigration benefit applications." Because this backlog is being created in large part by the FBI Defendant, this Court should find that the FBI Defendant, and correspondingly, the DHS Defendants have unreasonably delayed the processing of these applications.  For that reason, Fayyaz seeks an order compelling the FBI Defendant to take action.  Under the cases cited above, it may ultimately be necessary for the Court to maintain jurisdiction over this matter to monitor any future assurances from the FBI Defendant that it is addressing this backlog.

Fifth, the TRAC Court said that the court should also take into account the nature and extent of the interests prejudiced by the delay.  *Id.* at 80.

As of this date, Fayyaz has been denied the privilege of being a permanent lawful resident of the United States along with its accompanying benefits.  Fayyaz cannot travel abroad at this point.  Fayyaz cannot work in the United States without continuously seeking permission from the Defendants.  Because he is in limbo, he does not have the constitutional rights that U.S. citizens take for granted.  At such point that Fayyaz might be granted lawful permanent residency, he could file a petition for naturalization two years and nine months later.  In short, Fayyaz's life is at a complete standstill.

In contrast, the Defendants might cite the competing priorities of applications of other immigrants.  This argument has already been refuted earlier.

Sixth, the TRAC Court said that the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"  *Id.* at 80.

The Defendants have not shown good faith in addressing the delay because the FBI has not demonstrated any improvement in managing the processing of name checks despite the fact that this problem has existed for ten years. *Liberty Fund, Inc. v. Chao,* 394 F.Supp.2d at 120. The Defendants' do not offer any projected timeline that might provide relief in the foreseeable future. The Court can draw an inference of bad faith because of the agency's inaction in dealing with a problem that has existed for at least ten years and because the agency offers no solution. However, the Court does not necessarily have to draw such an inference. It is possible that the FBI Defendant can demonstrate its good faith by declaring to the Court a plan to resolve the backlog. In the absence of a proposed plan, the Court should be persuaded that the Defendants will not take any action on their own initiative and that mandamus and court oversight is warranted. In any case, the Court should find jurisdiction under the APA for the claim against the FBI Defendant. *Kaplan v. Chertoff,* 2007 WL 966510 (E.D.Pa.Mar. 29, 2007).

E.  Review under the APA is not precluded because of 5 U.S.C.§701(a)(2)

5 U.S.C.§701(a)(2) precludes review under the APA when "agency action is committed to agency discretion by law." Although the USCIS has the discretion to adjudicate the adjustment of status application, it has a nondiscretionary duty to process the application. *See eg. Kaplan v. Chertoff,* 2007 WL 966510 at *22 (E.D.Pa.Mar. 29, 2007). An applicant for adjustment of status "shall be notified of the decision of the director, and, if the application is deneied, the reasons for the denial." 8 C.F.R.§245.2(a)(5). Fayyaz complains that the application has not been processed after almost a lapse of three years. The USCIS does not have the discretion to refuse to process an application.

The Defendants are not complying with the Congressional intent that immigration applications be processed within 6 months. 8 U.S.C.§1571. The Defendants are not complying

with the Congressional mandate to reduce and eliminate the backlogs in processing immigration

applications.  8 U.S.C. § 1573.

"Although '[t]here 'is no *per se* rule as to how long is too long' to wait for agency action,

… a reasonable time for agency action is typically counted in weeks or months, not years." *U.S.*

*Women's Chamber of Commerce v. U.S. Small Business Admin.,* 2005 WL 3244182 (D.D.C.

Nov. 30, 2005) *citing Am. Rivers and Idaho Rivers United,* 372 F.3d 413, 419 (D.C.Cir.2004)

(*quoting Int'l Chem. Workers Union,* 958 F.2d 1144, 1149 (D.C.Cir.1992) (*citing Midwest Gas*

*Users Ass'n v. FERC,* 833 F.2d 341, 359 (D.C.Cir.1987).

It is true that under 8 C.F.R. § 103.2(b)(7) permits the USCIS to conduct an investigation

on an application.  If the Defendant Sharon A. Hudson, the Houston USCIS District Director,

decided to withhold adjudication on an application, then she must follow the strict procedures in

8 C.F.R. § 103.2(b)(18).  Ms. Hudson's declaration (Defendant's Motion, Exhibit A) does not cite

8 C.F.R. § 103.2(b)(7) or (18).  Ms. Hudson further does not state that this case has been reviewed

every six months as required by these regulations.  Further, although it is logical that the USCIS

should have the discretion to investigate an application, such an investigation does not mean that

the application process is beyond the jurisdiction of this Court.  When the agencies conducting

an investigation are taking an unreasonable amount of time to process the application, then the

alien rightfully complains to the Court.

F.  The Mandamus statute further confers subject matter jurisdiction

The Mandamus statute, 28 U.S.C. § 1361, further confers subject matter jurisdiction.

*Anjum v. Hansen,* 2007 WL 983215 (S.D.Ohio Mar.28, 2007) *citing Lazli v. U.S. Citizenship and*

*Immigration Servs,* 2007 WL 496351 (D.Or. Feb.12, 2007); *see also eg. Elkhatib v. Butler,* 2005

WL 5226742 (S.D.Fla.2005).  Plaintiff must first show that it has a "clear and certain claim."  *Id.*

Fayyaz properly filed the I-485 petition.  Therefore, he has a clear and certain claim to its

adjudication.  *Id.; see also Yu v. Brown.*  Plaintiff must next show that the respondent has a

"clear duty" to do the particular act requested.  *Id.*  Numerous District Courts have held that

USCIS has a "nondiscretionary duty" to the alien plaintiff to "adjudicate immigration petitions."

*Id.*  Plaintiff must finally show that there is no other remedy available.  *Id.*  District courts have

also agreed that continuing to wait indefinitely after more than three and a half years have

passed, for example, is not an adequate remedy.  *Lazli* at *14; *Anjum; Yu.*

## VI.  Conclusion

For the foregoing reasons, Plaintiffs request that the Court find that venue is proper and

that it has subject matter jurisdiction and deny Defendants' Motion.

Respectfully submitted,


/s/ Jonathan S. Rochkind
Jonathan S. Rochkind
Smith, Hudson & Carluzzo, P.C.
9300 West Courthouse Road
Judiciary Square – Suite 203
Manassas, Virginia 20110
(703) 361-0776 ext 107
DC Bar ID number 425185


COANE & ASSOCIATES


/s/ James P. McCollom, Jr.
Bruce A. Coane
SBOT No. 04423600
Ajay Choudhary
SBOT No. 90001623
James P. McCollom, Jr.
SBOT No. 13431960
3D/International Tower

1900 West Loop South
Suite 820
Houston, TX 77027-3206
713-850-0066
713-850-8528  FAX

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by electronic

means through the Electronic Case Filing system on April 18, 2007 to:

Ms. Karen L. Melnik
Assistant U.S. Attorney
Judiciary Center Building
555 4th Street, NW Rm. E-4112
Civil Division
Washington, DC 20530
Karen.melnik@usdoj.gov

/s/ James P. McCollom, Jr.
James P. McCollom, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMMAD FAYYAZ and | § | |
| GIZELA FAYYAZ, | § | |
| | § | |
| *Plaintiffs* | § | Civil Action No. 06-2016 (HHK) |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, THROUGH ITS | § | |
| SECRETARY, MICHAEL CHERTOFF, | § | |
| EMILIO GONZALEZ, DIRECTOR, | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| SHARON HUDSON, DISTRICT | § | |
| DIRECTOR, HOUSTON, USCIS, AND | § | |
| ROBERT MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF | § | |
| INVESTIGATION, | § | |
| | § | |
| *Defendants* | § | |

## <u>ORDER</u>

This Court finds that venue is proper in the District of Columbia.  The Court further finds that it has subject matter jurisdiction over this case.

Accordingly, this Court DENIES the Defendants' Motion to Transfer or, in the alternative, to Dismiss.

SIGNED at Washington, D.C. this _____ day of _____, 2007.

_____
UNITED STATES DISTRICT JUDGE

*Office of Communications*
**U.S. Department of Homeland Security**



February 20, 2007

# USCIS Update

### USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK
*Federal Litigation Removed as Sole Basis to Expedite Check*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

USCIS may continue to request an expedited FBI name check if the case meets one of the other approved criteria, including:

1. Military deployment,
2. Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas,
3. Significant and compelling reasons, such as critical medical conditions, and
4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

The FBI name check is an invaluable part of the security screening process, ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. USCIS also requests an FBI name check to screen out people who seek immigration benefits improperly or fraudulently and ensure that only eligible applicants receive benefits.

Information about the FBI name check is available on the USCIS website at http://www.uscis.gov or by calling the USCIS National Customer Service Center toll free at 1-800-375-5283.

–USCIS –

On March 1, 2003, U.S Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.   USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services,  while enhancing our nation's security.

UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

MOHAMMAD ABUSADEH,

      Plaintiff,

      v.

MICHAEL CHERTOFF, et al.,

      Defendants.

Case No.:  1:06-cv-2014
A No.:  072 421 518

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Mohammad Abusadeh, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies.  The Central

Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

### EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)    Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)    Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(C)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 96.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

1  reasons to explain why an F... Special Agent conducting an investigat... believed it important to

2  include a particular name in the FBI's index for later recovery.  The names are searched in a

3  multitude of combinations, switching the order of first, last, and middle names, as well as

4  combinations with only the first and last names, first and middle names, and so on.  The Program

5  application searches names phonetically against the Universal Index records and retrieves similar

6  spelling variations (which is especially important considering that many names in our indices

7  have been transliterated from a language other than English).

8       (12)  If there is a match with a name in a FBI record, it is designated as a "Hit,"

9  meaning that the system has stopped on a possible match with the name being checked.  If a

10  search comes up with a match to a name and either a birth date or social security number, it is

11  designated an "Ident."

## RESOLUTION RATE

13       (13)  Historically, approximately 68 percent of the name checks submitted by

14  USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72

15  hours.  A "No Record" indicates that the FBI's Universal Index database contains no identifiable

16  information regarding a particular individual.  Duplicate submissions (i.e., identically spelled

17  names with identical dates of birth and other identical information submitted while the original

18  submission is still pending) are not checked, and the duplicate findings are returned to USCIS

19  within 48-72 hours.

20       (14)  For the name check requests that are still pending after the initial

21  electronic check, additional review is required.  A secondary manual name search completed

22  within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having

23  "No Record," for a 90 percent overall "No Record" response rate.  The results of this 22 percent

24  also are returned to USCIS.  The remaining 10 percent are identified as possibly being the subject

25  of an FBI record.  At that point, the FBI record must be retrieved and reviewed.  If the record was

26  electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed

27  quickly.  If not, however, the relevant information must be retrieved from an existing paper

28

record. Review of this infor....ion will determine whether the inform...n is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)   The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)   The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When results of a name check are available, the FBI provides them to USCIS as quickly as possible.

(21)   It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

PLAINTIFF'S NAME CHECK REQUEST

(22)   The name check request for plaintiff Mohammad Abusadeh was received by the FBI from USCIS on or about April 28, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this *15* day of February 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.



Home   Contact Us   Site Map   FAQ

Search

Advanced Search

Services & Benefits        Immigration Forms        Laws & Regulations        About USCIS        Education & Resources        Press Room

Print This Page        Back

## U.S. Citizenship and Immigration Services
## Houston TX Processing Dates
## Posted March 15, 2007

**Notice**: U.S. Citizenship and Immigration Services (USCIS) has improved the reporting procedure for processing times of immigration benefit applications. In the past, USCIS benefit processing reports indicated the specific type of applications or petitions that were being processed and the date the cases were received. However, the date the case was received did not provide a clear indication of when USCIS expected to complete the case, nor did it provide a clear indication of USCIS' commitment to process cases within a certain cycle time. It also did not align with the processing times and cycle times the agency reports in other contexts.

This improved reporting procedure is an effort to give our customers more accurate information that better reflects current processing time and USCIS service level commitments. Effective immediately, when we are completing applications and petitions within our service level goals we will report that as the processing time. For example, when our service level goal is to process a particular kind of case within six months, and if our processing time is six months or less, we will show a date consistent with our service level goal because that reflects our commitment.

When we are not meeting our service level goal, the date posted will reflect the filing date of cases that are being completed. It should be noted that while in some instances reported processing dates may appear to have regressed due to this change, they do not reflect a lengthening of USCIS processing times, but simply the change in reporting. Our goal is to provide accurate projections and thus give customers clear expectations as to what they can expect as a processing time.

**There are several important exceptions to the processing times shown below:**

- Case processing will be delayed if we must ask you for more evidence or information.
  If we ask for missing required initial evidence, count the processing time from when we receive that missing evidence.
- The case processing timeframe will start over if a customer doesn't appear for an interview or asks that it be rescheduled.

**What if I have a problem or have questions about a case?**

We offer a variety of services after you file. For example, for most kinds of cases you can check the status of your case online.

For more information about when and how to contact us, whether your case is outside our processing time or if there are other issues, please see our fact sheet –

Case Services - How do I… know what kind of services are available to me after I file my application or petition?

One additional point about these projections.  They are the time to complete processing and mail the actual notice and/or document.  If you check case status online and see that your case has been approved, and you haven't yet received your approval notice or document in the mail, we ask that you wait thirty days from the approval date before contacting us.  That is because it may take that long before it is returned to us as undeliverable.  You can also print the case status online answer for your records.

District Office Processing Dates for **Houston TX** Posted March 15, 2007

| Form | Form Name | Now Processing Cases with Receipt Notice Date of: |
|------|-----------|---------------------------------------------------|
| I-131 | Application for Travel Documents | December 13, 2006 |
| I-485 | Application to Register Permanent Residence or Adjust Status | September 13, 2006 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | September 15, 2006 |
| I-600A | Application for Advance Processing of Orphan Petition | September 15, 2006 |
| I-765 | Application for Employment Authorization | December 27, 2006 |
| N-400 | Application for Naturalization | August 12, 2006 |
| N-600 | Application for Certification of Citizenship | July 22, 2006 |

Print This Page    Back

**04-18-2007 12:07 PM EDT**

Home   Contact Us   Privacy Policy   Website Policies   NoFEAR   Freedom Of Information Act   FirstGov

U.S. Department of Homeland Security